UNITED STATES of America,
Plaintiff-Appellee,

v.

Herman PADILLA,
Defendant-Appellant.

No. 86–1295.

United States Court of Appeals,
Tenth Circuit.

May 21, 1987.

versed because the record fails to establish that he knowingly and intelligently waived his right to be represented by counsel. We conclude that because the trial court failed to ensure defendant was aware of the dangers and disadvantages of self-representation, his waiver of counsel was invalid. We therefore reverse and remand for a new trial.

## I.

On September 23, 1983, Herman Padilla was arrested in front of his residence at 999 Camino del Gusto, Santa Fe, New Mexico, by Santa Fe police who responded to a report of a man firing shots. After disarming defendant and taking him into custody, officers entered his apartment where they discovered and seized several weapons. A federal weapons investigation ensued, resulting in the return of an indictment against defendant on February 24, 1984. Federal authorities attempted to arrest Mr. Padilla for several months but were unable to locate him. Eventually, defendant was arrested by state authorities on an unrelated homicide charge in the fall of 1984. After his state trial, he was transferred to federal custody and arraigned on August 29, 1985.

David N. Williams, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., Larry Gomez, Asst. U.S. Atty., and Richard J. Smith, Asst. U.S. Atty., with him on briefs), Albuquerque, N.M., for plaintiff-appellee.

Kevin Michael Shea of Holme Roberts & Owen, Colorado Springs, Colo., for defendant-appellant.

Before LOGAN, SETH, and MOORE, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

Herman Padilla appeals his convictions of two counts of possession of firearms by a felon in violation of 18 U.S.C. App. § 1202(a) and one count of possession of a firearm without a serial number in violation of 26 U.S.C. §§ 5861(i) and 5871. Defendant, who appeared pro se at his bench trial, contends his convictions must be re-

On August 23, 1985, a federal public defender, Peter Schoenburg, was appointed to represent Mr. Padilla. Mr. Schoenburg filed several pretrial motions on defendant's behalf. However, on October 23, 1985, Mr. Schoenburg moved to withdraw as defendant's counsel contending there was "a profound and irreconcilable animosity" between them. The district court granted the motion and appointed Reber Boult to represent defendant.

Mr. Boult's participation was short-lived. Defendant retained counsel from the law firm of Toulouse, Toulouse and Garcia, who entered an appearance on November 4, 1985. On counsel's motion, defendant's trial was continued to December 1, 1985. Shortly thereafter, defendant terminated employment of his retained counsel, stating he was ineffective. On November 26, 1985, counsel moved to withdraw contending

there had been a breakdown of the attorney-client relationship.

At a motions hearing on November 27, 1985, the district court granted counsel's motion to withdraw. To the court's inquiry regarding Mr. Padilla's proposed course of action for trial, he responded that he needed a continuance to find effective counsel or to conduct research prior to proceeding pro se. The court initially denied defendant's request, giving him the option of proceeding with current counsel or appearing pro se. When defendant refused to continue with current counsel, the court informed him he would have to proceed pro se. Thereafter, Mr. Padilla objected to appointment of any of his former counsel as standby counsel, and he waived his right to jury trial. The district court then continued defendant's trial for five days.

Mr. Padilla appeared pro se at his trial on December 6, 1985. On the same day, the court found him guilty on all three counts charged in the indictment. Thereafter, defendant retained Reber Boult to represent him. Mr. Padilla was sentenced on February 4, 1986, to a single sentence of two years on Counts I and II and to ten years on Count III, the sentences to run concurrently.

In this appeal, Mr. Padilla contends the record fails to establish that he knowingly and intelligently waived his right to be represented by counsel. He argues that because the record does not reflect he made "a clear and unequivocal declaration" of his desire to represent himself, but indicates he at best chose "the lesser of two perceived evils" offered by the district court, his decision to proceed pro se was not voluntary. Citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), Mr. Padilla further contends the district court did not meet its affirmative obligation to ensure that he was aware of the dangers and disadvantages of self-representation. Mr. Padilla's contention that his decision to proceed pro se was involuntary is not supported by the record. However, we agree that the district court did not ensure defendant was aware of the hazards of self-representation and there-

fore conclude his waiver of counsel was invalid.

### A.

■ When a defendant is given a clear choice between waiver of counsel and another course of action, such as retaining present counsel, the choice is voluntary as long as it is not constitutionally offensive. *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir.1976). A defendant forced to choose between incompetent or unprepared counsel and appearing pro se faces "a dilemma of constitutional magnitude." *Id.* The question of voluntariness therefore turns on whether defendant's objections to present counsel are such that he has a right to new counsel. "To warrant a substitution of counsel, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir.1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

■ The record demonstrates Mr. Padilla did not establish a right to new counsel. At the November 27, 1985 motions hearing, in response to the court's inquiries regarding defendant's objections to the appointment of any of his three prior counsel as standby counsel, the following colloquy developed:

MR. PADILLA: All counsel, your Honor, have failed to address the issue that I have been after.

THE COURT: What issue is it that you have in mind?

MR. PADILLA: I want them to go all the way back to the initial arrest and they haven't done it.

THE COURT: To the initial arrest.

MR. PADILLA: To find certain defenses for my defense and they haven't done it. All of them have overlooked it, purposely overlooked it or whatever. I don't know if it's discrimination or what itself, but I can't seem to find anybody that will go back far enough.

The defendant apparently found his appointed and retained counsel ineffective because they would not structure a defense as he directed.[1] However, his complaints about counsel do not constitute good cause for substitution of counsel. The Sixth Amendment provides no right to counsel blindly following a defendant's instructions. *McQueen v. Blackburn,* 755 F.2d 1174, 1178 (5th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985). Furthermore, there is no absolute right to counsel of one's choice. *United States v. Peister,* 631 F.2d 658, 661 (10th Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981). The record indicates the district court regarded defendant's request for substitution of counsel as a further attempt to delay the proceeding, and it supports the district court's view that defendant's objections to counsel were groundless. We conclude the choice given defendant between continuing with retained counsel or proceeding pro se was constitutionally permissible, and defendant's decision to represent himself was therefore voluntary.

**B.**

■ However, our inquiry does not end here. Even when a district court suspects manipulation on the part of a criminal defendant who seeks substitution of counsel, it must balance the need for efficient administration of the criminal justice system against the defendant's right to counsel. *United States v. Gipson,* 693 F.2d 109, 112 (10th Cir.1982), *cert. denied,* 459 U.S. 1216, 103 S.Ct. 1218, 75 L.Ed.2d 1455 (1983); *United States v. Weninger,* 624 F.2d 163, 166 (10th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980). The Supreme Court has stated:

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional bene-fits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, *he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."* *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (citations omitted) (emphasis added). While the record establishes defendant's decision to proceed pro se was voluntary, the question remains whether his choice was made knowingly and intelligently.

■■ *Faretta* requires a showing on the record that the defendant who elects to conduct his own defense had some sense of the magnitude of the undertaking and the hazards inherent in self-representation when he made the election. *Maynard,* 545 F.2d at 279. *See also United States v. Martin,* 790 F.2d 1215, 1218 (5th Cir.1986); *United States v. Mitchell,* 788 F.2d 1232, 1235 (7th Cir.1986). The task of ensuring that defendant possesses the requisite understanding initially falls on the trial judge, who must bear in mind the strong presumption against waiver. *Von Moltke v. Gillies,* 332 U.S. 708, 723, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948); *Gipson,* 693 F.2d at 111; *Weninger,* 624 F.2d at 164.

To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make

---

1. We recognize the district court should make formal inquiry into the defendant's reasons for dissatisfaction with present counsel when substitution of counsel is requested. *United States v. Welty,* 674 F.2d 185, 190 (3d Cir.1982); *United States v. Williams,* 594 F.2d 1258, 1260 (9th Cir.1979). While the court did not conduct a formal inquiry into defendant's reasons for terminating appointed and retained counsel, the omission is harmless where the defendant otherwise stated his reasons for dissatisfaction. *McKee v. Harris,* 649 F.2d 927, 933 (2d Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

*Von Moltke*, 332 U.S. at 723–24, 68 S.Ct. at 323. This court has reiterated that the factors articulated must be conveyed to the defendant *by the trial judge* and must appear on the record so that our review may be conducted without speculation. *Gipson*, 693 F.2d at 112. Because the record in this case fails to demonstrate the district court made the thorough and comprehensive examination of all the facts and circumstances contemplated by *Von Moltke* and its progeny, we cannot say Mr. Padilla made a knowing and intelligent waiver of his right to counsel.

The district court, as far as the record discloses, did not inform Mr. Padilla of the nature of the charges against him, the statutory offenses included, or the possible range of punishment. There was no discussion of possible defenses or mitigating factors which might be available to the defendant. Mr. Padilla was not cautioned until after trial began that he would be expected to follow applicable rules of evidence and procedure and that the judge could not assume the role of advisory counsel for him.[2] At a motions hearing ten days before trial, the following colloquy evolved:

THE COURT: We do have several motions on file here which have been filed by present counsel and this morning Mr. Padilla informed, the defendant, Mr. Padilla, informed that he was firing his counsel. We have a motion by counsel to withdraw, so I guess there's agreement on the part of counsel and the defendant, that defendant doesn't wish to proceed with counsel and counsel doesn't wish to proceed as counsel.

However, I have decided that this case is going to go to trial on Monday, Mr. Padilla. We have a situation here where previously the Court, based upon your representation that you could not afford counsel, appointed counsel for you.

We, or the magistrate appointed the Public Defender to represent you and Mr. Schoenburg was representing you. Apparently you couldn't get along with Mr. Schoenburg and he, I think, requested to

2. The defendant's confusion regarding the court's role is evidenced by the following exchange in the opening moments of trial:

MR. PADILLA: Your honor, first I would like to ask you a question. It's my understanding that you will protect my rights, am I correct?
THE COURT: I don't know—
MR. PADILLA: Maybe I should say it's the trial judge's responsibility to protect my rights, am I correct?
THE COURT: Well, I'm not going to sit here and advise you as counsel.
MR. PADILLA: No, no.
THE COURT: I will listen to the case as set by you—excuse me, as presented by the government and by you and then I will make what I feel is an appropriate determination based upon the law and the evidence.
MR. PADILLA: But that's—
THE COURT: I intend to sit here as the trial judge performing the functions of a trial judge and that's to preside in this trial. But I'm not going to and don't propose to advise you as to how you should proceed in reference to the case.
MR. PADILLA: Your honor, that's not what I meant.
THE COURT: All right. Perhaps I don't understand your question.
MR. PADILLA: What I'm saying is, sir, I'm ignorant of the law, I didn't have much time for preparation. I haven't had no college education to compete with a man who who's had seven or eight years and who knows how long, a few years in office.
At the most I had 10 days to do what I could do with what I already had or barely knew. And all I'm referring to is my rights not being violated, not advice.
THE COURT: Well, again, Mr. Padilla, all I will tell you is that I will preside as a trial judge here and I trust that I can preside with fairness and impartiality, but I don't propose to abandon my function as a trial judge and take up the function of advising you in any way as your trial counsel. Beyond that, I don't know how to answer your question, sir.
MR. PADILLA: Well, I thought it was a matter of law that the trial judge insured protection of the defendant's rights not being violated, that's all. I'm not asking advice, just that his rights are not violated.
THE COURT: Well, I certainly will attempt to enforce and abide by the proper rules concerning trial procedure and beyond that, and I suppose that that's what you're entitled to from the trial judge, is to see that you get a fair trial and I certainly propose to give you a fair trial.

be relieved and you may have joined in that request, I don't recall.

In any even, Mr. Schoenburg was relieved and the Mr. Reber Boult was appointed to represent you, and to assist you as counsel. It didn't take very long for you to fire Mr. Boult and you went out and hired your present counsel.

Now you're not satisfied with your present counsel. It appears that you're very difficult to satisfy as far as counsel is concerned. But I think that I have been patient enough with you insofar as changing counsel and going along and hearing your motions and postponing trial and so on and postponing motions and so on, the hearing on motions. So we're down to the end of the rope, Mr. Padilla. I want you to please come forward to the lectern so that you can speak into that microphone as we discuss this matter. Tell me—I want you to tell me now about your present feeling about present counsel. Do you wish to terminate him or have you terminated him?

MR. PADILLA: I did, your Honor, last Thursday, I believe.

THE COURT: You terminated counsel last Thursday?

MR. PADILLA: I did. It was oral. I told him orally that I didn't wish their services anymore.

THE COURT: You don't want him to represent you anymore?

MR. PADILLA: No, I don't.

THE COURT: Well, what is your proposal insofar as the trial coming up on Monday is concerned?

MR. PADILLA: Well, sir, I need an extension. If I can't find effective counsel to represent me, then I'm going to have to go pro se and in order to do that I've got to research what I have to look up.

THE COURT: No, sir, I'm not going to give you an extension, I've gone with you far enough. I've gone with you the last inch, really. You're either going to have to proceed pro se or you're going to have to have present counsel represent you.

MR. PADILLA: No, I will not have present counsel.

THE COURT: You won't have present counsel represent you. Okay. Well, then you will proceed pro se.

The record establishes only that defendant was dissatisfied with counsel and would proceed pro se if he could not obtain effective counsel. The court made no affirmative attempt to determine whether Mr. Padilla appreciated the hazards and disadvantages of self-representation.

 The government argues that Mr. Padilla's previous engagements with the criminal justice system, dating back to 1974, bred substantial familiarity such that he "surely possessed the background and experience to appreciate the importance of assistance of counsel." We recognize the question of an intelligent waiver turns not only on the state of the record, but on all the circumstances of the case, including the defendant's age and education, his previous experience with criminal trials, and representation by counsel before trial. *Maynard*, 545 F.2d at 279. In determining whether a defendant knowingly and intelligently waived his right to counsel, "we must consider 'the total circumstances of the individual case including background, experience and the conduct of the accused person.'" *Weninger*, 624 F.2d at 164 (*quoting United States v. Warledo*, 557 F.2d 721, 727 (10th Cir.1977)). *See also Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). However, consideration of all the available facts and circumstances of this case does not compel the conclusion that defendant made a knowing and intelligent waiver of representation by counsel.

 We acknowledge Mr. Padilla was no stranger to the criminal justice system. He was previously tried and convicted of a felony. In the instant case, Mr. Padilla was represented by counsel throughout the lengthy period of pretrial motions and a suppression hearing. By the time his trial began, he was undoubtedly aware of the charges against him and of possible defenses. However, this supposition is not confirmed by the record because the trial court

did not fulfill its obligation to ensure the defendant was aware of the factors articulated in *Weninger*. *Gipson*, 693 F.2d at 112. Moreover, the fact the defendant was an experienced litigant cannot, without more, establish that his decision to proceed pro se, in the face of the trial judge's mandate to choose between present counsel or self-representation, was knowingly and intelligently made. *United States v. Welty*, 674 F.2d 185, 191 (3d Cir.1982).

We hold that the trial judge should conduct an inquiry sufficient to establish a defendant's knowledge and understanding of the factors articulated in *Von Moltke*. No precise litany is prescribed. Rather, the court should question the defendant as long and as thoroughly as the circumstances of the case demand. *Von Moltke*, 332 U.S. at 723–24, 68 S.Ct. at 323; *United States v. Warledo*, 557 F.2d 721, 727 (10th Cir.1977). Without such an inquiry on the record, a determination that the defendant made his choice "with eyes open" cannot be made by a reviewing court without speculation. The absence of such an inquiry mandates that we conclude Mr. Padilla did not make a valid waiver of his right to representation by counsel.[3]

Although we reverse for a new trial, we emphasize that our disposition of the case is not an invitation to defendant to continue the pattern of hiring and firing attorneys. In light of Mr. Padilla's dismissal of three attorneys, the last his retained counsel on the eve of trial, we understand the district court's frustration and its concern that defendant would repeat the pattern if granted a fourth opportunity to obtain representation. A defendant may not use the right to refuse representation of counsel to play a cat and mouse game with the court. *Gipson*, 693 F.2d at 112. When faced with a situation of potential abuse, the district court may properly impose restraints on the right to reject counsel to prevent the right from being manipulated so as to obstruct the orderly procedure of the courts. *McKee*, 649 F.2d at 931.

**C.**

We also note that once a defendant has declared his desire to proceed pro se, appointment of standby counsel is a preferred, though not mandatory, practice. *McQueen*, 755 F.2d at 1178. We appreciate that Mr. Padilla objected to the district court's proposal to appoint one of his prior counsel as standby counsel. However, in *Faretta* the Supreme Court noted that "a State may—even over the objection of the accused—appoint standby counsel to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of defendant's self-representation is necessary." *Faretta*, 422 U.S. at 834–35 n. 46, 95 S.Ct. at 2541 n. 46. *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), made explicit what was implicit in *Faretta*:

> A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel—even over the defendant's objection—to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals. Participation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the pro se defendant's appearance of control over his own defense.

465 U.S. at 184, 104 S.Ct. at 954. In this case, defendant's concerns regarding the protection of his rights, expressed in the opening moments of trial, might have been assuaged by the appointment of standby counsel.

While we hold that appointment of standby counsel is preferred, we emphasize that the presence of advisory counsel in the courtroom or the defendant's acquiescence in counsel's participation does not, by itself,

---

**3.** In light of our disposition of the case, we need not decide a separate issue raised by defendant: whether the district court abused its discretion

in denying defendant a continuance to permit him to obtain new counsel or to conduct research in preparation for proceeding pro se.

relieve the district court of its responsibility to ensure that defendant's waiver of counsel is knowingly and intelligently made. Anything less than full representation by counsel raises the question of valid waiver of the right to counsel. *Maynard,* 545 F.2d at 277; *Warledo,* 557 F.2d at 727. Even if appointment of standby counsel is contemplated, the district court must fulfill its affirmative responsibility of ensuring defendant is aware of the hazards and disadvantages of self-representation.

## II.

Defendant raises several other issues. We consider those likely to occur on retrial.

### A.

Defendant argues that his convictions on Counts II and III of the indictment must be reversed because they are based on evidence obtained in violation of his Fourth and Fifth Amendment rights. At the time of defendant's initial arrest, Sergeant Pete Martinez, who was armed with a shotgun, and Detective Willy Angel confronted Mr. Padilla and ordered him to drop his weapon and to lie on his stomach with legs and arms spread.[4] Defendant complied, and the officers patted him down, determining that he carried no other weapons. After observing three bullet holes in a window of the residence, Detective Angel then inquired whether defendant was okay and defendant responded that he was. Detective Angel testified that he then asked, "how about inside the house" to which defendant responded, "I shot someone inside the house."

Detective Angel and another officer entered the residence, an efficiency apartment comprised of one main room and a bathroom, to look for an injured person. Detective Angel testified that as he walked in, he looked to his right into the bathroom where he observed five firearms and ammunition, including a semiautomatic .22 caliber pistol with a silencer attached. While

walking around the main room of the apartment, the officers also observed a .38 caliber derringer and some ammunition on the couch, a .9 millimeter semiautomatic pistol on the counter in the kitchen area, and a semiautomatic pistol in the bedroom area.[5] They also observed drugs and drug paraphernalia. After photographing the weapons and ammunition, the officers seized the evidence.

Mr. Padilla contends his statement that he shot someone in the house was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because it was the result of an interrogation conducted by police while he was in custody and before he was advised of his constitutional rights. The district court determined defendant's statement gave the officers probable cause to believe a crime had been committed and justified their warrantless search of his apartment. Defendant asserts that because the statement was illegally obtained, the search of his apartment rested upon a constitutional violation, and therefore the fruits of that search must be suppressed. We disagree based upon the Supreme Court's recognition of a public safety exception to the *Miranda* rule. *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

In *Quarles* the police encountered a rape suspect in a supermarket. At the time he was detained and frisked, defendant was wearing an empty shoulder holster. Before giving defendant his *Miranda* warnings, one officer asked him where the gun was. Defendant nodded toward some empty cartons and responded, "the gun is over there." After recovering a gun from one of the cartons, the officer formally arrested defendant and read him his rights.

In holding the gun was properly admitted into evidence, the Court stated:

> Whatever the motivation of individual officers in such a situation, we do not

---

4. The gun taken from Mr. Padilla, a Rossi .38 caliber revolver, was the basis for the first count of the indictment.

5. The guns found in the residence were the basis for Count II of the indictment. Count III was based on the silencer, which lacked a serial number.

believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety.

467 U.S. at 656, 104 S.Ct. at 2631–32. The Court concluded that "the need for answers in a situation posing a threat to public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment right against self-incrimination." 467 U.S. at 657, 104 S.Ct. at 2632. In devising an exception designed "to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront," the Court emphasized the distinction between questions necessary to secure the safety of police officers and the safety of the public and questions designed to elicit testimonial evidence. 467 U.S. at 658, 104 S.Ct. at 2633 (quoting *Dunaway v. New York*, 442 U.S. 200, 213–14, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979)).

■ The questions posed by Detective Angel fall within the former category. After apprehending Mr. Padilla, who had been waving a gun, and observing bullet holes in the window of the residence, Detective Angel was faced with the immediate necessity of determining whether someone inside was injured or armed or both. The detective needed a response to his questions, not to obtain evidence against Mr. Padilla, but to prevent further injury to anyone inside the house or to the officers outside. Once defendant responded that he shot someone inside the house, Detective Angel discontinued his questioning and entered the residence to search for an injured person.

The facts of this case bring it within the narrow exception to the *Miranda* rule prescribed in *Quarles*. We therefore conclude that defendant's statement that he shot someone inside the house was not obtained in violation of his Fifth Amendment rights and that Detective Angel's failure to administer *Miranda* warnings does not require suppression of the weapons found in the house as illegal fruits of a *Miranda* violation.

Mr. Padilla also argues that seizure of the weapons forming the basis of Counts II and III violated his Fourth Amendment rights. The district court ruled that seizure of the items was justified because the officers were legitimately on the premises, and they came upon the items in plain sight. Citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), defendant argues the fact that the weapons were in plain view is not sufficient to justify seizure because the police lacked probable cause to believe the items were fruits or instrumentalities of crime. He reasons that because the officers had no knowledge at the time of seizure that he was a felon, seizure of the weapons was a "wholesale seizure" condemned by the Fourth Amendment.

We recognize that in *Coolidge* the Court cautioned that plain view alone is never enough to justify the warrantless seizure of evidence and that "[i]ncontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause." 403 U.S. at 468, 91 S.Ct. at 2039. However, the Court itself noted it was merely stating a corollary to the principle that "no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" *Id.* In *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), the Court elaborated on the Fourth Amendment limits on seizure of items in plain view, stating the doctrine provides the basis for seizure of an item when an officer's access to the item has some prior constitutional justification: "'Plain view' is perhaps better understood, therefore, not as an independent exception to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." 460 U.S. at 738–39, 103 S.Ct. at 1541.

■ We begin by noting that the initial intrusion of the Santa Fe police into Mr. Padilla's residence was legitimate. The district court properly concluded Mr. Padil-

la's statement that he shot someone inside provided probable cause for the officers to enter the residence to search for an injured person. The "exigencies of the situation made the course imperative." *Coolidge*, 403 U.S. at 455, 91 S.Ct. at 2032 (quoting *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948)). Defendant does not argue otherwise, but bases his challenge to the legitimacy of the search solely on his contention that the statement which provided probable cause to search was obtained in violation of his Fifth Amendment rights.

■ Turning to defendant's argument that seizure of the weapons from the residence violated his Fourth Amendment rights because the police lacked probable cause to believe the weapons were instrumentalities of a crime, we recognize that such probable cause is required in order to invoke the plain view doctrine. *Arizona v. Hicks*, —— U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). In determining whether probable cause existed in the instant case, we are guided by the Court's long-standing direction that probable cause is "a flexible, common-sense standard" which "requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' . . . that certain items may be contraband or stolen property or useful as evidence of a crime." *Texas v. Brown*, 460 U.S. at 742, 103 S.Ct. at 1543 (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). The officer's belief that he is presented with evidence of a crime need not be certain or even more likely true than false; "[a] 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)).

■ With this direction in mind, it is evident Detective Angel and the officers accompanying him had probable cause to believe the weapons seized were instrumentalities of a crime. Five weapons and a silencer were discovered in the bathroom, where the removal of a floor board prior to the officers' arrival revealed their location. From the appearance at the scene, the weapons were at one time hidden beneath the board. Silencers are not used in recreational pursuits but are usually associated with the use of guns in criminal endeavor. The other weapons, a derringer, and two semiautomatic pistols were discovered elsewhere in the residence amidst a scene of complete disarray. The circumstances sufficiently established a " 'practical, nontechnical' probability" that incriminating evidence was involved. We conclude that seizure of the weapons did not violate defendant's Fourth Amendment rights.

**B.**

Mr. Padilla contends his convictions must be reversed and the charges against him dismissed because he was denied a speedy trial in violation of his Fifth and Sixth Amendment rights. While eighteen months elapsed between return of the indictment against the defendant and his arraignment, the record and applicable law do not sustain his assertions of constitutional violations.

Initially, we admit to some confusion regarding the precise nature and basis of defendant's argument regarding the delay in bringing him to trial on federal charges. While he specifically complains about the eighteen-month delay between indictment and arraignment, he cites the Fifth Amendment and cases elaborating on its protections with respect to *preindictment* delays. The due process clause of the Fifth Amendment is generally invoked with respect to preindictment delays where it has "a limited role to play in protecting against oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977).

Even if we consider defendant's contentions under the Fifth Amendment, it is plain there is no constitutional violation. We have held that under *Lovasco*, a defendant's rights flowing from the due process clause are not violated absent "a showing of actual prejudice resulting from preindictment delay and that the delay was purposefully designed to gain tactical ad-

vantage or to harass the defendants." *United States v. Jenkins,* 701 F.2d 850, 854 (10th Cir.1983) (quoting *United States v. Revada,* 574 F.2d 1047, 1048 (10th Cir. 1978)).

Mr. Padilla alleges the delay between his arrest and indictment prejudiced his ability to prepare a defense, though he does not elaborate on the precise nature of the disadvantage suffered. We have previously found such general, vague, and conclusory assertions of prejudice inadequate to establish a due process violation. *Jenkins,* 701 F.2d at 855. Defendant has also failed to demonstrate that the government engaged in delay to gain tactical advantage or to harass him. Therefore, we conclude defendant's Fifth Amendment rights were not violated.

Once a defendant is formally accused, the specific right to speedy trial provided by the Sixth Amendment is implicated. *United States v. McDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982). In *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), the Supreme Court set out four factors to be considered in determining whether a defendant was deprived of his Sixth Amendment right to speedy trial: 1) the length of the delay; 2) the reason for delay; 3) the defendant's assertion of his right; and 4) prejudice to the defendant. No one factor alone can establish a speedy trial violation; all must be considered together. 407 U.S. at 533, 92 S.Ct. at 2193.

The first and third factors are satisfied in this case. We previously held that a delay of sixteen months between indictment and arrest was presumptively prejudicial, triggering an inquiry into the other *Wingo* factors. *Jenkins,* 701 F.2d at 856.

Here, we deal with an eighteen-month delay between indictment and arraignment. With respect to the third factor, Mr. Padilla asserted his right to speedy trial. Soon after his arrest, he wrote to a federal magistrate expressing his desire to get the matter of the federal charges addressed.

Regarding the second *Wingo* factor, the government contends the delay between the federal indictment and Mr. Padilla's arrest in November 1984 was chiefly caused by Mr. Padilla's own efforts and by the fact he was "unarrestable" due to an ongoing sting operation. Defendant asserts he was "continually available to federal authorities" from the time he was indicted. His allegations are not supported by the record.

The record establishes that when a federal warrant for Mr. Padilla's arrest was issued shortly after return of the indictment, Special Agent Ted Alford of the Bureau of Alcohol, Tobacco, and Firearms attempted to locate defendant at his last known address in Santa Fe.[6] When he was not located there, Agent Alford interviewed members of his family, who stated defendant had moved and that they did not have an address for him. Federal agents contacted the state police narcotics division, the Drug Enforcement Administration in Albuquerque, the narcotics section of the Albuquerque police department, and the Bernalillo County sheriff's department, informing them that Mr. Padilla was wanted on federal charges. In September 1984, an officer from the New Mexico state police intelligence unit contacted federal authorities and informed them that Mr. Padilla was one target in an ongoing sting operation which he expected would culminate in Mr. Padilla's arrest on September 13, 1984.[7] However, law enforcement authori-

---

**6.** Agent Alford began his investigation of defendant for firearms violations on the day of his initial arrest by Santa Fe police. He sent one of the pistols seized, a High Standard .22 caliber with a silencer, along with descriptions of the other firearms, to the Firearms Technology Branch of the Bureau in Washington, D.C. Agent Alford received a report from the Branch in January 1984. Shortly thereafter, he submitted his investigative case report to the U.S.

Attorney's Office, which presented the case to the federal grand jury on February 23, 1984.

**7.** According to the testimony of state police officers involved in the sting operation, they became aware of the outstanding federal warrant for Mr. Padilla's arrest shortly before the sting operation was to end. Apparently, any delay in attempts by federal authorities to arrest Mr. Padilla due to fears of jeopardizing the operation were minimal.

ties were unable to locate him at that time. Defendant was arrested by state authorities late in November 1984.

On November 30, 1984, after learning that defendant had been arrested on a state homicide charge, Agent Alford requested that a federal detainer be placed on defendant. Mr. Padilla was tried on the state charge in Santa Fe County and was convicted of two counts of aggravated assault. Thereafter, he was transferred to federal custody and almost immediately arraigned on the weapons charges on August 29, 1985.

 Contrary to defendant's assertions, federal authorities were unable to locate him despite their efforts. Mr. Padilla's allegations that the government intentionally failed to arrest him are unsubstantiated. There is no indication in the record that authorities were negligent in their attempts to locate defendant. Moreover, as soon as Mr. Padilla was tried on state charges, the federal government promptly obtained custody and arraigned him. We therefore conclude the reasons for delay between indictment and arraignment do not weigh against the government.

There is no support for a speedy trial violation with respect to the fourth *Wingo* factor, prejudice to the defendant. As we noted above, defendant has done nothing more that present vague, conclusory allegations that he was prejudiced in the preparation of his defense by the delay between indictment and arraignment.

We therefore conclude defendant's Sixth Amendment right to speedy trial was not violated. For most of the time period in question, Mr. Padilla was free and presumably going about his business. "The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved circumstances." *McDonald*, 456 U.S. at 8, 102 S.Ct. at 1502.

**C.**

Mr. Padilla argues his convictions of Counts II and III must be reversed because the evidence was insufficient to establish an essential element of the offenses, that he had possession of the firearms taken from the residence at 999 Camino del Gusto. He contends that because the government failed to produce any evidence that he had exclusive access to the efficiency apartment, he is entitled to a presumption that other persons occupied the premises.

 As the government points out, defendant and the government agreed to have the trial judge consider evidence produced at the pretrial suppression hearing in determination of defendant's guilt. At that hearing, Mr. Padilla's mother testified that defendant lived in the apartment where the firearms were found. His niece and nephew testified Mr. Padilla was the only resident of the apartment. Furthermore, at trial, the officers who discovered the weapons testified they observed mail and a medication bottle with Mr. Padilla's name on it in the apartment. Under the circumstances, we conclude the evidence was sufficient to establish that Mr. Padilla possessed the weapons found there.

**D.**

In light of our disposition of the issues presented, it is unlikely the remaining issue raised by defendant, that the district court's exclusion of testimonial evidence violated his Fifth and Sixth Amendment rights, will arise on retrial. Either defendant failed to subpoena the witnesses whose testimony he wished to present, or he neglected to apprise them of a change in trial date. After the prosecution rested, Mr. Padilla informed the court of their absence and his desire to have them testify. The district court refused to continue the proceedings. Because the circumstances leading to the witnesses' absences are unlikely to recur, we do not decide whether defendant's constitutional rights were violated by exclusion of their testimony.

REVERSED AND REMANDED.