**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 14 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

T. ROBERT HUGHES; ARCO
PROPERTIES, LTD.,

        Defendants - Appellants.

No. 98-5218

---

Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 97-CR-98-C)

---

R. Thomas Seymour (C. Robert Burton and F. Randolph Lynn on brief), Tulsa,
Oklahoma, for Defendants-Appellants.

Gordon B. Cecil, Special Assistant United States Attorney (Stephen C. Lewis,
United States Attorney, on brief), Muskogee, Oklahoma, for Plaintiff-Appellee.

---

Before **TACHA, MAGILL,**[*] and **BRISCOE,** Circuit Judges.

---

**MAGILL,** Circuit Judge.

---

[*]Honorable Frank Magill, Senior Circuit Judge, United States Court of Appeals for
the Eighth Circuit, sitting by designation.

T. Robert Hughes and a business trust managed by Hughes appeal from their convictions on one count of conspiracy to defraud the government.  On appeal, Hughes argues that the evidence at trial showed that both defendants withdrew from the conspiracy, and thus that their prosecution was barred by the statute of limitations.   Hughes, who is an attorney, also argues that the district court erred in allowing him to represent himself pro se at trial.  We affirm.

## I.

## A.  Conspiracy

Hughes, an attorney, was a longtime business associate of the late Thomas Rhoades.[1]  In February 1988 Rhoades and his business associate, Stephen Schluneger, furnished payment and performance bonds for a government contract entered into by Frank Minelli (Minelli contract) with the United States Army Corps of Engineers (Corps) for sandblasting and painting various locks and dams along the Arkansas River.  As sureties, Rhoades and Schluneger were liable on the contract if Minelli defaulted.

Minelli did default, and the Corps demanded that Rhoades and Schluneger satisfy their obligations under the bonds.  At the time of default, the amount

---

[1]Rhoades, a codefendant in this case, passed away after trial on June 21, 1998. The government dismissed the indictment against him on August 3, 1998.

remaining on the Minelli contract was approximately $1.69 million. Rhoades accepted a bid from Skyline Painting Inc. (Skyline) to complete the work for $1.2 million.

After accepting Skyline's bid, Rhoades and Schluneger informed the Corps that they wished to sign a Takeover Agreement. The Takeover Agreement was an agreement with the Corps which, inter alia, prohibited Rhoades and Schluneger from receiving any compensation for the work performed except for "actual costs and expenses incurred in the completion of the work." Takeover Agreement ¶ 8. The Takeover Agreement provided that Rhoades and Schluneger were not to be compensated for "any amount in excess of [their] total expenditures necessarily made in completing the work and discharging" their liability under the performance bond. Id. ¶ 10. Hughes reviewed a preliminary draft of the Takeover Agreement, and Rhoades and Schluneger eventually signed it on August 14, 1989.

After receiving the Skyline bid but before signing the Takeover Agreement, Rhoades and Schluneger entered into a series of other agreements, all prepared by Hughes and not disclosed to the Corps, which had the intent and effect of billing the government for more than Rhoades and Schluneger's actual costs and expenses. Essentially, their plan was to recover the difference remaining on the Minelli contract over and above the price of the Skyline bid.

The plan worked in the following manner. Rhoades and Schluneger initially had Skyline sign a subcontract which stated that Skyline would complete the work for $1.69 million. Skyline understood, however, that it was to receive only $1.2 million, and that the $490,000 difference was to be paid over time to Rhoades and Schluneger as finder's fees and engineering consulting fees. These "fees," however, were for work which was never done and were merely the device by which Rhoades and Schluneger were to obtain the money.

Under the subcontract with Skyline, Skyline included these sham fees in the progress reports it prepared and submitted to the Corps. Rhoades would receive the payments and make disbursements to Skyline. Skyline, pursuant to a second agreement prepared by Hughes, would pay a percentage of those payments to ARCO Business Services, Ltd. (ARCO Business Services), one of Hughes's business trusts. ARCO Business Services would then distribute funds to ARCO Properties, Ltd. (ARCO Properties), another Hughes business trust. ARCO Properties, pursuant to a third agreement prepared by Hughes, would distribute funds to Rhoades. Rhoades distributed part of the kickbacks to his wife and to Schluneger. Although Hughes did not receive any portion of the kickbacks directly, Rhoades agreed to discharge a debt Hughes owed him as compensation for his efforts in creating the scheme.

This scheme continued over the next three years.  At some point, Skyline began experiencing financial problems and abandoned the project.  On June 27, 1992, after Skyline abandoned the project, ARCO Business Services sent a letter to Rhoades.  The letter was prepared and signed by Hughes as Trustee for ARCO Business Services.  It stated that since Skyline had stopped work on the project, the contract was "in effect null and void. . . .  ARCO does not intend to be involved in any legal process under such conditions and as of today does not intend to seek or claim further benefit of any kind."   Appellant's App. at 252.  The letter further stated, "Thank you for your many efforts in this enterprise and please convey ARCO's current position and its appreciation for the various endeavors undertaken to all of the other concerned/involved parties . . . ." Id. (emphasis added).

The scheme was discovered when Schluneger and Rhoades subsequently defaulted on the contract.  The jury convicted Rhoades, Schluneger, Hughes, ARCO Business Services, and ARCO Properties each on one count of conspiracy to defraud the government.  By special verdict, the jury found that ARCO Business Services withdrew from the conspiracy in June 1992.  The jury found that neither Hughes nor ARCO Properties withdrew from the conspiracy.  Hughes and ARCO Properties moved for a judgment of acquittal or a new trial.  The district court denied the motion.  Hughes was subsequently sentenced to twenty-

four months' imprisonment and three years' supervised release, and was ordered to pay $236,158 in restitution.[2]

## B. Waiver of Counsel

All defendants were indicted in July 1997. Hughes secured counsel for himself and both ARCO trusts in July. Trial was originally set for September 8, 1997, but, for various reasons, was rescheduled for February 23, 1998.

On January 23, 1998, Hughes's attorneys filed a motion to withdraw as counsel for Hughes and the ARCO trusts. They cited several reasons for their motion, including conflicts over their roles in the litigation, ethical conflicts, and Hughes's failure to abide by terms of their representation agreement. See Appellant's App. at 13-14. They stated that Hughes had been given reasonable warning that counsel would withdraw unless the terms of their representation agreement were fulfilled. See id. Hughes did not oppose the motion, and the district court granted the motion on February 3.

On February 11, Hughes submitted a memorandum to the court stating that he had contacted substitute counsel and was waiting for this attorney to agree to represent him. The memo also requested that Hughes be allowed to proceed pro se to join any pending motions and to submit points of law related to his and both

---

[2]ARCO Properties was sentenced to three years probation and ordered to pay restitution in the amount of $236,158. At the time of sentencing, however, ARCO Properties was an inactive company with no assets.

ARCO trusts' defense. On February 18, Hughes filed a motion to sever or, alternatively, for a continuance. He advised the court that, although he had tried to secure counsel, he had been unable to do so and that the attorney he had contacted had not had sufficient time to review the case to decide whether he would agree to represent Hughes and the ARCO trusts.

The next day, February 19, the district court held a pretrial conference to consider Hughes's motions and other substantive pretrial matters. Hughes informed the court that he had contacted an attorney who had agreed preliminarily to represent him and that Hughes was waiting for a final answer from the attorney, which could come on that day or the next. Hughes then stated, however, that he could be ready to proceed to trial himself as scheduled, depending on how the court ruled on other substantive motions. The court then considered those motions, with Hughes participating and arguing points of law. After ruling in the government's favor on these substantive motions, the court considered Hughes's motion to sever or for a continuance. The court denied the motions and ordered that the trial go forward as scheduled. The court did not conduct a colloquy regarding Hughes's waiver of his right to counsel. Finally, during trial, after the close of the government's case, Hughes again moved for a continuance to secure counsel, which the court denied.

## II.

Hughes first argues that the evidence at trial demonstrated that both he and ARCO Properties withdrew from the conspiracy in June 1992, and thus that their convictions were barred by the statute of limitations. Hughes also raises, for the first time on appeal, two other arguments related to the burden of proof and the jury instructions on the conspiracy charge. We address each argument in turn.

## A.

Hughes first argues that because the jury in this case found that ARCO Business Services withdrew from the conspiracy, no rational jury could have failed to find that found that both he and ARCO Properties also withdrew. Thus, he argues, the district court erred in denying his and ARCO Properties's motion for a new trial or a judgment of acquittal. We review the denial of a judgment of acquittal de novo and the denial of motion for a new trial for an abuse of discretion. See United States v. Ailsworth, 138 F.3d 843, 846 (10th Cir. 1998). In reviewing these motions, we view the evidence in the light most favorable to the government. See id.

"In order to withdraw from a conspiracy an individual must take affirmative action, either by reporting to the authorities or by communicating his intentions to his coconspirators." United States v. Powell, 982 F.2d 1422, 1435 (10th Cir. 1992); see also United States v. Parnell, 581 F.2d 1374, 1384 (10th Cir. 1978).

Mere cessation of one's participation in a conspiracy is insufficient to demonstrate withdrawal. See id. Since neither Hughes nor ARCO Properties disclosed the conspiracy to the authorities, Hughes and ARCO Properties can demonstrate withdrawal only if each took affirmative steps to communicate an intent to withdraw to the coconspirators.

The only evidence of withdrawal by any party in this case is the June 1992 letter from ARCO Business Services. This letter, on ARCO Business Services letterhead, was from "ARCO BUSINESS SERVICES, LTD." and signed by Hughes as trustee. Appellant's App. at 252. This letter does not establish an affirmative act of withdrawal by ARCO Properties, and there is no other evidence of an intent to withdraw by ARCO Properties.

Nor does the letter establish an affirmative act of withdrawal by Hughes. The letter was signed by Hughes in his capacity as trustee, not individually. The letter stated that ARCO "does not intend to seek or claim further benefit of any kind," asks to whom "ARCO should send any notice of its position," and requests that Rhoades "convey ARCO's current position . . . to all of the other concerned/involved parties . . . ." Id. The letter does not refer at all to Hughes individually or to his continued involvement in the Skyline project. The fact that the jury found that Hughes's company, ARCO Properties, withdrew does not dictate a finding that Hughes as trustee also withdrew. Cf. United States v.

Dotterweich, 320 U.S. 277, 279 (1943) (rejecting defendant's claim that jury's conviction of defendant was inconsistent with jury's acquittal of corporation of which defendant was president and general manager).

We conclude, therefore, that the district court did not err in denying Hughes and ARCO Properties's motion for a new trial or judgment of acquittal.

**B.**

Hughes next argues that the district court's jury instruction on the withdrawal defense was erroneous in that it stated that the defendants had to prove withdrawal by a preponderance of the evidence. Hughes argues that the government bears the burden of proof on what he calls the "element" of withdrawal. Because Hughes did not object to this instruction, we review for plain error. See United States v. Fabiano, 169 F.3d 1299, 1302 (10th Cir. 1999).

To establish plain error Hughes "must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affect[s] substantial rights." Id. at 1303 (quotation marks omitted) (alteration in original). If Hughes satisfies these criteria, this Court "may exercise discretion to correct the error if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (quotation marks omitted) (alteration in original).

In this circuit, the law is clear that the defendant bears the burden of establishing withdrawal from a conspiracy. See United States v. Fox, 902 F.2d

1508, 1516 (10th Cir. 1990); Parnell, 581 F.2d at 1384. Hughes argues that this Court should ignore Tenth Circuit law and hold that once a defendant produces sufficient evidence of a prima facie case of withdrawal, the burden shifts to the government to rebut that showing. See, e.g., United States v. Steele, 685 F.2d 793, 804 (3d Cir. 1982). However, we cannot overrule the judgment of a prior panel of this court. See In re Smith, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam). Even if we were able or inclined to do so, Hughes and ARCO Properties have failed to present any evidence of their withdrawal from the conspiracy. The jury instruction in this case was in accord with the law of this Circuit, and thus there was no plain error.

## C.

Hughes's final challenge to the conspiracy count relates to the verdict forms. The verdict forms in this case first required the jury to find the defendants guilty or not guilty on the conspiracy charge. If the jury found the defendants guilty, it would then consider whether each defendant withdrew from the conspiracy. If the jury found withdrawal, then that defendant's conduct would have been outside the statute of limitations and the court would enter a verdict of not guilty. Hughes argues that this format, which first required a finding of guilt, put undue pressure on the jury to find the defendants guilty. Because Hughes did

-11-

not object to the verdict forms at trial, we review for plain error. See Fabiano, 169 F.3d at 1302.

The defense of withdrawal does not exonerate a defendant for past conduct; it can exonerate him only as to future conduct by his coconspirators. See Fox, 902 F.2d at 1516. However, a defense of withdrawal can take the past conduct for which he would otherwise be liable outside the statute of limitations. See United States v. Nava-Salazar, 30 F.3d 788, 799 (7th Cir. 1994) ("A withdrawal defense to a conspiracy charge is relevant only when coupled with the defense of statute of limitations. Withdrawal does not absolve a defendant from his membership in the conspiracy." (quotation marks and citation omitted)). When considering a defense of withdrawal where the conspiracy is already under way, it stands to reason that, in order for a jury to find that a defendant withdrew from the conspiracy, it must first find that he was part of a conspiracy. Thus, it was logical and proper for the court to pose the questions in the order that it did: liability first, and then the defense of withdrawal which would have taken the defendant's otherwise criminal conduct outside the statute of limitations. Accordingly, we conclude there was no error in the verdict forms.

**III.**

Hughes next argues that the district court violated his Sixth Amendment right to counsel by failing to ensure that he voluntarily, knowingly, and intelligently waived his right to counsel. We review the validity of a waiver of the right to counsel de novo. See United States v. Taylor, 113 F.3d 1136, 1140 (10th Cir. 1997).

The Sixth Amendment of the United States Constitution guarantees a right to counsel in criminal proceedings. See U.S. Const. amend. VI; United States v. Collins, 920 F.2d 619, 624 (10th Cir. 1990). At the same time, a criminal defendant has a right under the Sixth Amendment to waive this right to counsel and conduct his own defense. See Faretta v. California, 422 U.S. 806, 834 (1975); Taylor, 113 F.3d at 1140. This waiver will be valid only if it is "an intentional relinquishment or abandonment of a known right or privilege." Id. (quotation marks omitted). Thus, the court must ensure that the waiver was voluntary, knowing, and intelligent. See id. "Ideally, the trial judge should conduct a thorough and comprehensive formal inquiry of the defendant on the record to demonstrate that the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se." United States v. Willie, 941 F.2d 1384, 1388 (10th Cir. 1991) (citing Faretta, 422 U.S. at 835); see also United States v. Padilla, 819 F.2d 952, 959 (10th Cir. 1987).

There are certain limited situations, however, where a waiver may be valid absent this inquiry by the court. We have previously warned that "[t]he right to make a knowing and intelligent waiver of the right to counsel does not grant the defendant license to play a cat and mouse game with the court, or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel." United States v. Allen, 895 F.2d 1577, 1578 (10th Cir. 1990) (quotation marks omitted). Accordingly, this Court has recognized that a defendant may waive his right to counsel by his conduct, particularly when that conduct consists of tactics designed to delay the proceedings. See Willie, 941 F.2d at 1389-91. In such a situation, a waiver may be valid absent an inquiry by the court where "the surrounding facts and circumstances, including [the defendant's] background and conduct, demonstrate that [the defendant] actually understood his right to counsel and the difficulties of pro se representation and knowingly and intelligently waived his right to counsel." Id. at 1389.

The facts and circumstances in this case support a valid waiver by conduct. Once the court granted Hughes's attorneys' motion to withdraw, Hughes had a month to find new counsel. Instead of immediately asking for a continuance, Hughes requested permission to proceed pro se to participate in pretrial motions

-14-

and other pretrial matters.  He did not request a continuance until the eve of trial, and only did so once it appeared that things were not going his way.  This dilatory conduct demonstrates that Hughes voluntarily chose to proceed without counsel. See United States v. Mitchell, 777 F.2d 248, 258 (5th Cir. 1985) ("no matter how fundamental the right to counsel may be, it may not be used as a means of delaying or trifling with the court").

Hughes's decision to proceed without counsel was also knowing and intelligent.  A defendant's background, experience, and conduct are all relevant in determining whether a waiver was knowing and intelligent.  See Taylor, 113 F.3d at 1140.  In our view, Hughes, a practicing attorney, made deliberate decisions regarding his representation, decisions which he cannot now claim resulted in a violation of his right to counsel.  Although an on-the-record colloquy would have been preferable, see id. at 1141; Padilla, 819 F.2d at 959, we cannot conclude that Hughes, having handled his case in the manner he did,  did not knowingly and intelligently waive his right to counsel.  See Willie, 941 F.2d at 1388-89 (finding waiver valid despite lack of colloquy; defendant stated to court that he would not accept any court-appointed attorney and submitted numerous motions on his own behalf).[3]

_____

[3]In the alternative, Hughes argues that the district court erred in denying his motion for a continuance to obtain new counsel.  A trial court "enjoys broad discretion on matters (continued...)

**IV.**

For the foregoing reasons, we AFFIRM the decision of the district court.

---

[3](...continued)
of continuances, even when the parties implicate Sixth Amendment issues." <u>United States v. Mendoza-Salgado</u>, 964 F.2d 993, 1016 (10th Cir. 1992). Because we find that Hughes validly waived his right to counsel, a continuance to obtain new counsel was not warranted. Thus, the district court was within its discretion in denying the continuance.