**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 15, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

No. 17-4159

LOUIS DELYNN HANSEN,

    Defendant - Appellant.

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:16-CR-00534-CW-1)**

---

Josh Lee, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Gregory S. Knapp, Attorney (Richard E. Zuckerman, Principal Deputy Assistant Attorney General; S. Robert Lyons, Chief, Criminal Appeals & Tax Enforcement Policy Section; and Gregory Victor Davis, Attorney; with him on the brief), Tax Division, U.S. Dept. of Justice, Washington, D.C. for Plaintiff-Appellee.

---

Before **HOLMES**, **BALDOCK**, and **CARSON**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Louis Hansen, a taxpayer who ascribes to legal theories associated with

sovereign-citizen and tax-protester movements, was indicted for tax evasion in violation of 26 U.S.C. § 7201 and tax obstruction in violation of 26 U.S.C. § 7212(a). Before trial, Mr. Hansen purported to waive his right to counsel. The district court held a hearing to determine whether this waiver was made knowingly and intelligently. At that hearing, the district court asked Mr. Hansen, among other things, whether he understood he would be required to follow federal procedural and evidentiary rules if he proceeded without counsel. Mr. Hansen's response was at best ambiguous and unclear; at one juncture, he specifically told the court that he did *not* understand that he would be required to abide by these rules. Without seeking clarification from Mr. Hansen, the court accepted the waiver. Mr. Hansen represented himself at trial, and the jury convicted him of both tax evasion and tax obstruction.

On appeal, Mr. Hansen argues that his waiver of the right to counsel was invalid because it was not made knowingly and intelligently. We recount the relevant background and legal standards before agreeing with Mr. Hansen. We conclude that the court incorrectly determined that Mr. Hansen's waiver was knowing and intelligent.

In particular, we determine that the court failed to engage in a sufficiently thorough colloquy with Mr. Hansen that would properly warn him that—if he proceeded pro se—he would be obliged to adhere to federal procedural and evidentiary rules. We recognize that, under limited circumstances, certain case-

2

specific factors could permit us to conclude that, despite the district court's inadequate warnings, it nevertheless correctly determined that Mr. Hansen's waiver of the right to counsel was knowing and intelligent at the time it was made. But, after careful consideration of the record, we discern no such case-specific factors.

Accordingly, we reverse the district court's waiver determination and remand the case, instructing the court to vacate its judgment regarding Mr. Hansen in full and to conduct further proceedings consistent with this opinion.

## I

We start by describing (1) the conduct that led to Mr. Hansen's indictment; (2) his indictment, initial appearance, and surrounding events; (3) the circumstances of the pretrial hearing that addressed the validity of Mr. Hansen's purported waiver of the right to counsel; and (4) pertinent aspects of Mr. Hansen's post-hearing conduct.

## A

At trial, Mr. Hansen testified that he began falling behind on his taxes in 1999 after making the decision to pay various creditors "instead of paying the IRS." R., Vol. II, at 472, 546 (Trial Tr., dated July 7, 10–12, 2017); *see also id.*, Vol. III, at 68–69, ¶¶ 4–9 (Presentence Investigation Report ("PSR"), filed Sept. 14, 2017). Over time, Mr. Hansen's tax liability grew, with penalties and interest added to the original unpaid taxes. By 2012, Mr. Hansen owed the IRS $342,699.

Mr. Hansen initially tried to negotiate a payment plan with the IRS, but he testified that he later made the unilateral decision to send the IRS multiple checks written on closed accounts. He also sent the IRS a letter claiming that these checks would pay his outstanding taxes.[1] While Mr. Hansen was sending these checks, the IRS contacted Mr. Hansen—through a tax-resolution firm that he had hired—to instruct him to stop sending the checks. Even after Mr. Hansen received this admonishment, he continued to send additional checks written on closed accounts to the IRS; the financial institution declined to honor these checks because the accounts were closed. Mr. Hansen did make some valid payments toward his outstanding taxes, however, but he never reached a

---

[1] The idea to write checks on a closed account apparently grew out of certain seminars that Mr. Hansen attended. These seminars taught taxpayers that they could "setoff" tax debts using checks drawn on closed accounts. This teaching appears to derive from an idiosyncratic reading of Black's Law Dictionary, which defines a "closed account" as "[a]n account that no further credits or debits may be added to but that remains open for adjustment or *setoff*." *Account*, BLACK'S LAW DICTIONARY 22 (11th ed. 2019) (emphasis added). Mr. Hansen purported to believe, based on the seminars and this definition, that "[w]hen someone closes their checking account, it remains open on the bank[']s side" for setoffs, and so a taxpayer could "utiliz[e] a closed account and an [electronic funds transfer] written on that closed account to pay the IRS." R., Vol. VI, Ex. 79 (Email from Mr. Hansen to Berkshire Capital, dated June 8, 2012) (citing BLACK'S LAW DICTIONARY). *But see Setoff*, BLACK'S LAW DICTIONARY 1648 (11th ed. 2019) ("A debtor's right to reduce the amount of a debt *by any sum the creditor owes the debtor* . . . ." (emphasis added)). While Mr. Hansen professed to believe that these checks would pay off his tax delinquency, he admitted at trial that he had "no idea" where the money would come from that was supposedly being used to pay the IRS and that the whole endeavor was "something desperate." R., Vol. II, at 502.

4

settlement agreement with the IRS.

**B**

Mr. Hansen was subsequently charged with committing tax evasion in violation of 26 U.S.C. § 7201 and tax obstruction in violation of 26 U.S.C. § 7212(a). Section 7201 imposes criminal penalties on "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by [the Internal Revenue Code] or the payment thereof." Section 7212(a) criminally sanctions anyone who "corruptly . . . endeavors to . . . impede any officer or employee of the United States acting in an official capacity under [the Internal Revenue Code], or in any other way corruptly . . . obstructs or impedes, or endeavors to obstruct or impede, the due administration of [the Internal Revenue Code]." The operative indictment charged Mr. Hansen with violating these laws by presenting the checks to the IRS drawn on closed accounts and by sending the accompanying letter to the IRS claiming that the checks had paid his tax debt.

At Mr. Hansen's initial appearance on these charges, a magistrate judge informed him generally of his "right to be represented in this proceeding," but Mr. Hansen declined the appointment of counsel. R., Vol. IV, at 230–31, 235 (Tr. of Initial Appearance, dated Nov. 17, 2016). Waiver of the right to counsel was not discussed further at this hearing, though Mr. Hansen did indicate that he was aware of the charges against him and the penalties associated with those charges. He truthfully informed the magistrate judge that he did not have a prior criminal

record.  *See id.* at 243–44 ("I don't have a criminal history . . . .").  The remainder of the hearing largely concerned Mr. Hansen's challenge to the court's jurisdiction over him and whether Mr. Hansen should be released pending trial.

Even before this initial appearance, Mr. Hansen had begun peppering the district court with filings questioning the court's jurisdiction over him.  For example, he submitted a document, from "DeLynn of the Lawful House of Hansen," that purported to "release and discharge Judge Clark Waddoups from his emergency war powers jurisdictional duties created by Section 17 of the 'Trading with the Enemy Act'" and to "inform the court that [Mr. Hansen], a Private American National Citizen who has harmed nobody and nothing [does] not consent to statutory military jurisdiction of any kind."  *Id.*, Vol. I, at 46 (Decl. of Political Status, and Release and Discharge for Judge Clark Waddoups, filed Nov. 15, 2016).  Throughout the proceedings, Mr. Hansen continued to submit filings that reprised tax-protester and sovereign-citizen theories similar to those that we have previously rejected as frivolous.  *See, e.g.*, *Ford v. Pryor*, 552 F.3d 1174, 1177 n.2 (10th Cir. 2008); *Lonsdale v. United States*, 919 F.2d 1440, 1448 (10th Cir. 1990).

## C

Because Mr. Hansen refused appointment of counsel at his initial appearance, the district court later held a hearing to determine whether Mr. Hansen was validly waiving his right to counsel.  The court started by asking Mr.

6

Hansen whether he wanted to proceed without counsel:

> The Court: [I]s it your request, [Mr. Hansen], that you represent yourself?
>
> Mr. Hansen: I am myself.
>
> The Court: That is not my question. I know you're yourself. My question is --
>
> Mr. Hansen: I can't represent myself because I am myself.
>
> The Court: Do you wish to appear without counsel?
>
> Mr. Hansen: Yes.

R., Vol. I, at 225 (Tr. of Miscellaneous Hr'g, dated Jan. 9, 2017). Moving past this confusion, the judge proceeded to read Mr. Hansen the indictment, to advise Mr. Hansen that the maximum punishment allowed by § 7201 was a fine of up to $100,000 and imprisonment of up to five years, to advise Mr. Hansen that the maximum punishment allowed by § 7212(a) was a fine of up to $5,000 and imprisonment of up to three years,[2] and to warn Mr. Hansen that "tax matters can be complicated" and that trial was fast approaching. *Id.* at 231.

The court asked Mr. Hansen whether he had any questions. Mr. Hansen responded: "Your Honor, here is the defendant Louis Delynn Hansen. This is the

---

[2] The transcript of the hearing states that the judge advised Mr. Hansen about *§ 7201(a)*, but 26 U.S.C. § 7201(a) does not exist. Instead, the district court appears to be discussing Count Two of the operative indictment, which involves § 7212(a). Notably, the potential penalties mentioned by the district court correspond to those applicable for violations of § 7212(a). Neither party addresses this apparent misstatement, and it does not affect our analysis.

7

fiction that the court has named as a defendant. This is not me." *Id.* at 232. The district court brushed off this response because it was "not a question." *Id.*

The court then asked the government whether anything else needed to be addressed. At the government's request, the district court proceeded to ask Mr. Hansen whether he was under the influence of any drugs (he responded in the negative), about his education (he had a chiropractic doctorate), and about whether he had prior legal experience (he did not have any). More specifically, as to the last item (i.e., legal experience), Mr. Hansen—who had no prior criminal record—responded "No," when the court inquired whether he had "ever been sued or been a party to a lawsuit." *Id.* at 234. Finally, the court asked Mr. Hansen whether he understood "that in a legal proceeding there are rules that the court will follow and will require that all of the parties before the court follow." *Id.* Mr. Hansen responded "Yes." *Id.*

After providing these answers, Mr. Hansen asked whether accepting counsel would "put [him] in the jurisdiction of the court." *Id.* at 235. The judge explained to Mr. Hansen that the court already had jurisdiction over him; Mr. Hansen responded with a stream of jurisdictional statements related to his earlier filings. *See, e.g., id.* ("I am not a U.S. citizen, I'm not a citizen of the United States, I'm an American State National."). The judge warned Mr. Hansen that these jurisdictional arguments were frivolous, that they had been rejected by the courts of appeals, and that he was facing the risk of a term of imprisonment.

8

The judge then circled back to a topic that he had touched on earlier:

> The Court: You understand that if you choose to represent yourself you will be required to comply with the rules of procedure in this court and the rules of evidence. Do you understand that?
>
> Mr. Hansen: *No*.
>
> The Court: If you do not comply with the rules, you will not -- *if you do not commit yourself to being prepared to comply with the rules, you're not in a position to represent yourself*.
>
> Mr. Hansen: I shouldn't even be in this court because I am not the defendant.

*Id.* at 237 (emphases added). Mr. Hansen then veered into a discussion of how "President FDR and [C]ongress concocted a fraud upon the American people." *Id.* at 238.

At this point, the government commented that it had "some pause and concern as to whether it would be appropriate under these circumstances for Mr. Hansen to represent himself" because Mr. Hansen "specifically said he could not abide by the rules of procedure and evidence." *Id.* at 239–40. Mr. Hansen denied that he had said he could not abide by the rules, but when asked again whether he would "endeavor to [his] best effort to comply with the rules of procedure and the rules of evidence," he responded: "I can't represent myself because I am myself." *Id.* at 240. He then returned to his jurisdictional arguments, asking the district court to "present this United States of America with photo I.D. so that [he could] face [his] accuser." *Id.* at 240–41.

9

Mr. Hansen again asked whether accepting representation would "change anything as far as jurisdiction." *Id.* at 241. After the district court patiently repeated its assurances that it would not, the government, for a second time, expressed "some significant concerns as to whether it would be appropriate for the court to permit [Mr. Hansen] to represent himself in this matter." *Id.* at 245. In response, the court took a recess to allow Mr. Hansen to meet privately with potential standby counsel. Nothing in the record reveals the substance of that meeting.

After his meeting with standby counsel, Mr. Hansen apologized for his earlier outburst. He also affirmed that he would like the standby counsel to be appointed. After this statement, the district judge stated:

> I find that you do fully understand the risks and that with [standby counsel's] support and counsel you are capable because of your education, intelligence and prior experience . . . to represent yourself. I find that the risks of doing so have been fully explained to you and the risk of a prosecution that may result in a conviction is one that you understand.

*Id.* at 247. The hearing moved on to unrelated issues before concluding.

**D**

At a later pretrial conference, Mr. Hansen and the court further discussed his decision to proceed pro se. Mr. Hansen told the court that he would "take the lead" in his defense but that the standby counsel would ask Mr. Hansen questions when he testified. R., Vol. II, at 107 (Tr. of Pretrial Conf., dated June 30, 2017).

10

Mr. Hansen also wanted his standby counsel to address "legal issues that may arise outside of the presence of the jury." *Id.* at 107–08. During this hearing, the district court told Mr. Hansen that "although [he had] chosen to present [his] own defense, [he was] still required to follow the rules of procedure and the rules of evidence." *Id.* at 119. Mr. Hansen, however, did *not* respond to this statement.

At trial, Mr. Hansen called three witnesses in addition to himself and cross-examined the government's witnesses. Throughout his opening and closing statements, he oscillated between arguing that his checks had been accepted by the IRS and arguing that he believed that the checks had been accepted, even if they were not. The jury found him guilty on both counts. The district court sentenced Mr. Hansen to thirty-three months in prison, imposed three years of supervised release with various special conditions of supervision, and ordered that Mr. Hansen pay $342,699 in restitution.

Mr. Hansen appealed.

## II

We now discuss the legal standards governing our review of whether the district court erred in determining that Mr. Hansen waived his right to counsel knowingly and intelligently. In this discussion, we clarify that our caselaw requires us to consider all of the circumstances of the particular case that properly bear on whether the defendant knowingly and intelligently waived the right to counsel—not just the colloquy between the court and the defendant at the waiver

hearing.  We also clarify that under controlling precedent the trial court need not follow a precise script or litany in providing warnings to a defendant regarding the hazards of self-representation, and that, even if the court fails to properly convey one or more important warnings to a defendant, this failure will not in every instance demonstrate that the court erred in finding the waiver knowing and intelligent at the time it was made.  In particular, we recognize that, under limited circumstances, certain case-specific factors could permit a reviewing court to conclude that, despite the district court's inadequate warnings, it correctly concluded that the defendant's waiver of the right to counsel was knowing and intelligent at the time it was made.

**A**

In discussing the legal framework governing our review of Mr. Hansen's waiver, we start with our standard of review.  Then, we address the substantive standards governing the validity of a waiver of the right to counsel.  Finally, we reject two of Mr. Hansen's related arguments: (1) that our exclusive focus in assessing the validity of a defendant's waiver of the right to counsel is the trial court's self-representation warnings to the defendant in the waiver hearing (i.e., the so-called *Faretta* hearing), and (2) that, if the court fails to adequately warn the defendant about even one subject that the Supreme Court highlighted in *Von Moltke v. Gillies*, 332 U.S. 708 (1948) (plurality opinion), then a reviewing court must conclude that the defendant's waiver was not knowing and intelligent and

12

reverse.

**1**

"We review the validity of a waiver of the right to counsel de novo and the underlying factual findings for clear error." *United States v. Williamson* ("*Brett Williamson*"), 859 F.3d 843, 862 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 1324 (2018). While our published cases have consistently engaged in de novo review of waivers of the right to counsel, *see, e.g.*, *United States v. Vann*, 776 F.3d 746, 762 (10th Cir. 2015); *United States v. Krejcarek*, 453 F.3d 1290, 1296 (10th Cir. 2006); *United States v. Taylor*, 113 F.3d 1136, 1140 (10th Cir. 1997), the government suggests that plain-error review may be appropriate here because Mr. Hansen failed to object to the district court's decision to allow him to proceed pro se, *see* Aplee.'s Resp. Br. at 18.[3] But, while Mr. Hansen did not object to the court's waiver decision, "the district court *sua sponte* raise[d] and explicitly resolve[d] an issue of law on the merits," i.e., whether the waiver was knowing and intelligent. *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003). We have said that, "[i]n such a case, review on appeal is not for

---

[3] One panel of this court has stated that the validity of a waiver of the right to counsel is subject to plain-error review. *See United States v. Green*, 336 F. App'x 837, 839 n.2 (10th Cir. 2009) (unpublished). However, it is axiomatic that unpublished decisions are not controlling authority, and we decline to adopt in this published opinion *Green*'s non-binding statement that plain error is the appropriate standard for reviewing the validity of a defendant's waiver of the right to counsel.

'plain error,' but is subject to the same standard of appellate review that would be applicable if the appellant had properly raised the issue." *Id.*; *see United States v. Jim*, 786 F.3d 802, 810 (10th Cir. 2015) (reviewing de novo, in reliance on *Hernandez-Rodriguez*, whether defendant's guilty plea was knowing and voluntary); *cf. Von Moltke*, 332 U.S. at 723 ("The constitutional right of an accused to be represented by counsel invokes, *of itself*, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel." (emphasis added) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938))).

Furthermore, our approach accords with that taken by at least a plurality of our sister circuits. *See United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004) ("[W]e do not expect pro se defendants to know the perils of self-representation, and consequently, we cannot expect defendants to recognize that they have not been correctly and fully advised, let alone to point out the court's errors."); *see also United States v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015) ("We find the Ninth Circuit's reasoning [in *Erskine*] persuasive, and conclude that its holding applies equally to cases in which a pro se defendant fails to object to a district court's finding of forfeiture [of the right to counsel]."); *cf. United States v. Stanley*, 739 F.3d 633, 644 n.2 (11th Cir. 2014) (acknowledging that "[a]pproaches to this question differ across, and even within, other circuits" (collecting cases)); *United States v. McBride*, 362 F.3d 360, 365 (6th Cir. 2004)

14

(commenting that "[o]ur sister circuits uniformly apply a de novo standard of review to a district court's conclusion of law that a defendant has waived his right to counsel" before noting, but not resolving, an intra-circuit split in the Sixth Circuit's authority).

Thus, we reject the government's argument for plain-error review and apply de novo review to Mr. Hansen's challenge.

**2**

"[T]he Constitution does not force a lawyer upon a defendant. He may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open." *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942); *accord Iowa v. Tovar*, 541 U.S. 77, 87–88 (2004); *see United States v. Turner*, 287 F.3d 980, 983 (10th Cir. 2002) ("A lawyer cannot be forced upon a defendant who wishes to waive his right to counsel even if self-representation would be detrimental."); *see also Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("Our precedents . . . place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent."); *Brett Williamson*, 859 F.3d at 861 ("A defendant has the Sixth Amendment right to waive his right to counsel and represent himself in a criminal case." (citing *Faretta v. California*, 422 U.S. 806, 821 (1975))).

"In the normal course," *Vann*, 776 F.3d at 763, "[w]e conduct a two-part

15

test to determine whether a defendant has effectively waived his right to counsel," *Brett Williamson*, 859 F.3d at 862. "First, we must determine whether the defendant voluntarily waived his right to counsel." *Id.* (quoting *Taylor*, 113 F.3d at 1140). However, that question is not implicated here. Mr. Hansen does not argue that his waiver was involuntary; so, we need not address this aspect of his waiver's validity. "[S]econd, we must determine whether the defendant's waiver of his right to counsel was made knowingly and intelligently." *Id.* (quoting *Taylor*, 113 F.3d at 1140); *see Faretta*, 422 U.S. at 835 (stating that "the accused must 'knowingly and intelligently' forgo" those benefits traditionally "associated with the right to counsel" (citing *Johnson*, 304 U.S. at 464–65)).

This second, knowing-and-intelligent inquiry is the focus of our analysis. "[K]nowingly and intelligently waiving the right to counsel is different from making a wise decision." *Turner*, 287 F.3d at 984. Instead, the Supreme Court's and our own cases make clear that, "[b]efore a court may grant a waiver, *it* must ensure the defendant is 'aware of the dangers and disadvantages of self-representation.'" *Brett Williamson*, 859 F.3d at 862 (alteration in original) (emphasis added) (quoting *Maynard v. Boone*, 468 F.3d 665, 676 (10th Cir. 2006)); *accord Faretta*, 422 U.S. at 835; *see Tovar*, 541 U.S. at 88–89 ("[B]efore a defendant may be allowed to proceed *pro se*, he must be warned [by the district court] specifically of the hazards ahead."); *Turner*, 287 F.3d at 984 ("[K]nowing and intelligent means only that [a defendant] was reasonably informed by the

16

court of the hazards of self-representation and had sufficient understanding of those hazards.").

The "tried-and-true method" for a district court to assess whether a waiver is being made knowingly and intelligently is to "conduct a thorough and comprehensive formal inquiry of the defendant on the record." *Vann*, 776 F.3d at 763 (quoting *United States v. Willie*, 941 F.2d 1384, 1388 (10th Cir. 1991)). Such a formal inquiry typically takes place in the context of a waiver hearing, customarily referred to as a *Faretta* hearing, in recognition of the Supreme Court's seminal waiver case, *Faretta*. *See id.* *Faretta* hearings are intended to "ensure[] the defendant is not unwittingly or impulsively disposing of his constitutional right to counsel," *id.*, by determining whether "the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se," *Brett Williamson*, 859 F.3d at 862 (quoting *Vann*, 776 F.3d at 763). These topics of inquiry stem from Justice Black's plurality opinion in *Von Moltke*. *See* 332 U.S. at 724.

We have specifically recognized these topics and, in discussing Justice Black's opinion, observed that a knowing and intelligent waiver can only be made with the defendant's "apprehension" of:

> the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof,

17

and *all other facts essential to a broad understanding of the whole matter.*

*United States v. Weninger*, 624 F.2d 163, 164 (10th Cir. 1980) (emphasis added) (quoting *Von Moltke*, 332 U.S. at 724).  These topics, which substantially overlap with those discussed in *Brett Williamson*, may be aptly referred to as the "*Von Moltke* factors."  *United States v. Behrens*, 551 F. App'x 452, 457 (10th Cir. 2014) (unpublished); *see, e.g.*, *United States v. McConnell*, 749 F.2d 1441, 1451 n.5 (10th Cir. 1984) (noting that such areas of inquiry are "taken from the Supreme Court's opinion in *Von Moltke*").

The Supreme Court has emphasized that the requisite thoroughness of the district court's inquiry into the relevant factors should be viewed through a "pragmatic" lens—that is, the degree of thoroughness should correspond to how "substantial" and "obvious" the dangers of self-representation are at any particular stage of the criminal proceedings.  *Patterson v. Illinois*, 487 U.S. 285, 298, 299–300 (1988); *see Tovar*, 541 U.S. at 90 ("*Patterson* describes a 'pragmatic approach to the waiver question,' one that asks 'what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage,' in order 'to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.'" (quoting *Patterson*, 487 U.S. at 298)).  Thus, as relevant here, the

18

Supreme Court "require[s] a more searching or formal inquiry before permitting an accused to waive his right to counsel at trial than [it] require[s] for a Sixth Amendment waiver during postindictment questioning." *Patterson*, 487 U.S. at 299. More specifically, "[w]arnings of the pitfalls of proceeding to trial without counsel . . . must be 'rigorous[ly]' conveyed." *Tovar*, 541 U.S. at 89 (second alteration in original) (quoting *Patterson*, 487 U.S. at 298).

"[W]e 'indulge in every reasonable presumption against waiver.'" *United States v. Simpson*, 845 F.3d 1039, 1046 (10th Cir.) (quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977)), *cert. denied*, 138 S. Ct. 140 (2017); *see Von Moltke*, 332 U.S. at 723–24 ("To discharge this duty [of inquiry] properly in light of the *strong presumption against waiver* of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand." (emphasis added) (footnote omitted)); *United States v. Padilla,* 819 F.2d 952, 956 (10th Cir. 1987) ("The task of ensuring that defendant possesses the requisite understanding initially falls on the trial judge, who must bear in mind the *strong presumption against waiver*." (emphasis added)); *United States v. Williamson* ("*John Williamson*"), 806 F.2d 216, 219–20 (10th Cir. 1986) ("Courts indulge every presumption against the waiver of fundamental constitutional rights. . . . [D]oubts concerning an attorney waiver must be resolved in the defendant's favor . . . ." (citations omitted)).

Nevertheless, the Supreme Court has not "prescribed any formula or script

19

to be read to a defendant who states that he elects to proceed without counsel." *Tovar*, 541 U.S. at 88. Relatedly, the Court has acknowledged that "[t]he information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.*; *see Johnson*, 304 U.S. at 464 ("The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.").

Our caselaw embodies the substance of the Supreme Court's pragmatic approach. Notably, in *Padilla*, although we held that "the trial judge should conduct an inquiry sufficient to establish a defendant's knowledge and understanding of the factors articulated in *Von Moltke*," we also made clear that "[n]o precise litany is prescribed" for the court's knowing-and-intelligent inquiries. 819 F.2d at 959.

And, relatedly, our cases have repeatedly stressed that the knowing and intelligent nature of the waiver of the right to counsel turns on the "totality of the circumstances, including the background, experience, and conduct of the defendant." *John Williamson*, 806 F.2d at 220; *see Vann*, 776 F.3d at 763 ("We reflect on the totality of the circumstances to decide whether a defendant has

20

knowingly [and intelligently] decided to proceed *pro se*."); *Padilla*, 819 F.2d at 958 (recognizing that "the question of an intelligent waiver turns not only on the state of the record [including presumably the court's inquiry into the *Von Moltke* factors in a *Faretta* hearing], but *on all the circumstances of the case*, including the defendant's age and education, his previous experience with criminal trials, and representation by counsel before trial" (emphasis added)); *Weninger*, 624 F.2d at 164 ("To ascertain whether [a defendant] knowingly and intelligently waived his right to counsel, we must consider 'the total circumstances of the individual case including background, experience and the conduct of the accused person.'" (quoting *United States v. Warledo*, 557 F.2d 721, 727 (10th Cir. 1977))); *see also Turner*, 287 F.3d at 983 (endorsing an inquiry into "the surrounding facts and circumstances" to determine whether a defendant knowingly and intelligently waived the right to counsel); *cf. John Williamson*, 806 F.2d at 219 (noting that "[e]ach case must be reviewed individually, with the objective of determining whether the judge fully inquired into the circumstances").

Consistent with the Court's approach—which eschews formalism in favor of pragmatism, *see Tovar*, 541 U.S. at 90; *Patterson*, 487 U.S. at 298—we have recognized that, though it is certainly true that "the *Faretta* hearing is one way—probably the best way—for the district court to satisfy itself that defendant's waiver of a right to counsel was done intelligently," "a *Faretta*

21

hearing is only 'a means to [an] end' of ensuring a voluntary and intelligent waiver, and the absence of that means is 'not error as a matter of law.'" *Vann*, 776 F.3d at 763 (alteration in original) (quoting *United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014)).

"In other words, a contemporaneous and comprehensive [*Faretta*] hearing is generally a *sufficient* condition to a knowing waiver, but it is *not* a *necessary* one." *Id.* (emphases added); *see Turner*, 287 F.3d at 983 (noting that although "[i]t is 'ideal' when the trial judge conducts a 'thorough and comprehensive formal inquiry' including topics such as the nature of the charges, the range of punishment, possible defenses, and a disclosure of risks involved in representing oneself *pro se*," the "failure to conduct this inquiry does not require automatic reversal" (quoting *Willie*, 941 F.2d at 1388)). Indeed, "while the hearing itself is a known quantity, we have recognized that '[t]here are certain limited situations . . . where a waiver may be valid' *even when the inquiry by the court is deficient*." *Vann*, 776 F.3d at 763 (alteration and omission in original) (emphasis added) (quoting *United States v. Hughes*, 191 F.3d 1317, 1323 (10th Cir. 1999)).

In particular, such may be true when "surrounding facts and circumstances indicate that the defendant 'understood his right to counsel and the difficulties of *pro se* representation'" at the time of the waiver. *Turner*, 287 F.3d at 983 (quoting *Willie*, 941 F.2d at 1389); *see Vann*, 776 F.3d at 763 (discussing our conclusion to this effect in *Hughes*, 191 F.3d at 1323, in the context of holding

22

that a *Faretta* hearing is only "one way . . . for the district court to satisfy itself that defendant's waiver of a right to counsel was done intelligently"); *McConnell*, 749 F.2d at 1451 (noting that, while "[t]he record shows that the trial judge did not strictly follow the test" consisting of a formal, *Von Moltke*-based inquiry, "it would be absurd in this case to believe that [the defendant] did not make a knowing and intelligent waiver," in part because the court's "detailed discussion of the hazards of proceeding pro se[] [was] by no means a 'hollow compliance with the mandate of the Constitution'" (quoting *Von Moltke*, 332 U.S. at 723)); *see also John Williamson*, 806 F.2d at 220 (finding "no merit in [the defendant's] contention that a valid waiver of counsel requires . . . an explanation of the possible defenses to the charge," although this is a factor mentioned in *Von Moltke*, and holding that "[t]he totality of the circumstances, including the background, experience, and conduct of the defendant, show that [the defendant] knowingly and intelligently waived his right to counsel"); *cf. Warledo*, 557 F.2d at 727 (noting in dicta that, although "[u]ndoubtedly the trial court could have questioned the defendants with more particularity" regarding the *Von Moltke* factors, "the sum total" of the particular circumstances in that case "do[] not, however, constitute a deprivation which would of itself justify a reversal"); *McConnell*, 749 F.2d at 1451 n.5 (noting that *Von Moltke* "appears to be substantially distinguishable from the present circumstances" in significant part because there "the trial judge apparently made only a token effort to comply with

23

his constitutional mandate to protect the interests of the defendant").

**3**

Mr. Hansen vigorously argues, however, for a different understanding of our governing law—one that rejects the pragmatic approach to assaying whether a waiver of a right to counsel was knowing and intelligent. He insists that we should deem controlling those cases that have "repeatedly h[e]ld that the trial judge 'must' explicitly inquire into *all* the *Von Moltke* factors on the record, that a comprehensive colloquy is 'essential to a determination that a waiver has been knowingly and intelligently made,' and that the absence of a comprehensive colloquy 'mandates' reversal." Aplt.'s Reply Br. at 9 (emphasis added) (quoting first *Sanchez v. Mondragon,* 858 F.2d 1462, 1467 (10th Cir. 1988), *partially abrogated on other grounds by United States v. Allen*, 895 F.2d 1577, 1580 n.1 (10th Cir. 1990) (rejecting in an en banc footnote the holding that failure to secure an adequate waiver of counsel can be harmless error), then quoting *United States v. Gipson*, 693 F.2d 109, 112 (10th Cir. 1982), *partially abrogated on other grounds by Allen*, 895 F.2d at 1580 n.1, and finally quoting *Padilla*, 819 F.2d at 959).

In addition to the quoted language from our *Sanchez* decision, Mr. Hansen bases his contentions on our decisions in *Padilla* and *Gipson*. These two cases contain some broad language that, at least at first blush, arguably lends support to Mr. Hansen's position. *See, e.g.*, *Padilla*, 819 F.2d at 957 (noting that "the record

24

. . . fail[ed] to demonstrate the district court made the thorough and comprehensive examination of all the facts and circumstances contemplated by *Von Moltke* and its progeny," and thus "we [could] []not say [the defendant] made a knowing and intelligent waiver of his right to counsel."); *id.* at 959 ("We hold that the trial judge should conduct an inquiry sufficient to establish a defendant's knowledge and understanding of the factors articulated in *Von Moltke*."); *Gipson*, 693 F.2d at 112 (stating that "[t]he trial judge must ensure that the defendant is aware of all of the factors [i.e., of *Von Moltke*] . . . essential to a determination that a waiver has been knowingly and intelligently made" and that "[t]hese factors must be conveyed to the defendant by the trial judge, and must appear in the record so that we may perform our review without having to speculate").

Mr. Hansen asserts that our decisions in *Vann* and *Turner*—as well as *Willie*, the case upon which these two cases allegedly rest—"are not good law and should not be followed" because they evince "a classic intra-circuit conflict," and "[a]*ll* of the cases that support Mr. Hansen's position preceded *all* of the cases that support the Government's position." Aplt.'s Reply Br. at 8–9 (capitalization and bold-face font omitted). Under settled intra-circuit conflict rules, *see, e.g.*, *United States v. Sabillon-Umana*, 772 F.3d 1328, 1334 n.1 (10th Cir. 2014), Mr. Hansen thus contends that we should adhere to the earlier precedent—that is, published Tenth Circuit cases decided before *Willie*, *Vann*, and *Turner*.

We are not persuaded. The broad language from *Padilla*, *Sanchez*, and

25

*Gipson* that Mr. Hansen necessarily rests his argument on cannot be viewed in isolation. Indeed, in *Padilla* itself, although we held that "the trial judge should conduct an inquiry sufficient to establish a defendant's knowledge and understanding of the factors articulated in *Von Moltke*," we also evinced a pragmatic approach in defining the means that a trial judge may use to reasonably ensure that the defendant possesses such knowledge and understanding of those factors—specifically, holding that "[n]o precise litany is prescribed" for the court's knowing-and-intelligent inquiries. 819 F.2d at 959. Furthermore, we specifically "recognize[d] the question of an intelligent waiver turns not only on the state of the record [including presumably the court's inquiry into the *Von Moltke* factors in a *Faretta* hearing], but on *all the circumstances of the case*, including the defendant's age and education, his previous experience with criminal trials, and representation by counsel before trial." *Id.* at 958 (emphasis added). That we evinced such a pragmatic approach in *Padilla* is significant because, as *Sanchez* itself instructs, *Padilla* is a case "where we refined the appellate standard for reviewing a trial court's handling of a self-representation request," *Sanchez*, 858 F.2d at 1464. Furthermore, even prior to *Padilla*, we intimated in *Gipson*, notwithstanding its broad language, that the knowing-and-intelligent assessment was not limited to an examination of the court's colloquy with a defendant regarding the *Von Moltke* factors. *See Gipson*, 693 F.2d at 111–12 (noting that the *Von Moltke* factors are designed "to ensure that the

26

defendant knows the possible consequences of waiving counsel" but notably bemoaning the fact that the record provided only "conjectures" regarding factors not strictly covered by *Von Moltke* but typically examined under the pragmatic approach, such as the defendant's "extensive past experiences with the federal and state criminal justice systems").

In the same vein, but more fundamentally, we must endeavor to interpret our cases in a manner that permits them to coexist harmoniously with overarching and controlling Supreme Court precedent and with each other. *See Carter v. Bigelow*, 787 F.3d 1269, 1280 (10th Cir. 2015) (discerning a "far more reasonable interpretation" of prior Tenth Circuit precedent than found by the district court that "harmonizes with existing authority" of the Supreme Court and the Tenth Circuit); *United States v. Capler*, 636 F.3d 321, 329 (7th Cir. 2011) (reasoning that "the decision that controls the outcome of this appeal" "survived" intervening Supreme Court authority and, more specifically, that the decision's "analysis is in harmony with the present-day approach of the Supreme Court"); *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860, 863 (Fed. Cir. 1985) ("[S]tatements in opinions of this court must be read harmoniously with prior precedent, not in isolation."); *see also* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT § 36, at 300 (2016) (noting that "decisions of equal authority" [i.e., from the same court] that appear to be "discordant" "should be harmonized" "[i]f at all possible" (bold-face font omitted)). And, as explicated

27

above, Supreme Court precedent reflects "a more pragmatic approach to the waiver question" than Mr. Hansen's formalistic and rigid reading of our cases would permit. *Patterson*, 487 U.S. at 298; *accord Tovar*, 541 U.S. at 90.

Recall that, under that pragmatic approach, the Court has not "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Tovar*, 541 U.S. at 88. Likewise, the Court has recognized that "[t]he information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* Putting it another way, the Court has specifically stated that "[t]he determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson*, 304 U.S. at 464. And, as explicated *supra*, many of our cases, including *Willie*, *Vann*, and *Turner*, embody the substance of the Supreme Court's pragmatic approach.

Given all of this, we are very reluctant to read the controlling rule of our cases as being—as Mr. Hansen would have it—that a district court is required in every instance to conduct a comprehensive formal inquiry (i.e., a *Faretta* hearing) in which it propounds queries to a defendant regarding each and every *Von Moltke* factor in order to avoid reversal of its finding that the defendant's waiver of the

28

right to counsel was knowing and intelligent at the time it was made. And, in fact, we need not read the rule of our cases that way. Nor is it necessary for us to conclude that any of our cases are in irreconcilable conflict with Supreme Court authority or each other. Properly understood, our cases all can and do coexist harmoniously.

In this regard, the referenced broad language of *Padilla*, *Sanchez*, and *Gipson* is quite congruent with the Supreme Court's authority and the full body of our own caselaw insofar as that language is read as merely underscoring that "*Faretta* requires a showing on the record that the defendant who elects to conduct his own defense had some sense of the magnitude of the undertaking and the hazards inherent in self-representation when he made the election"; that the district court "must bear in mind the strong presumption against waiver"; and that propounding queries regarding the *Von Moltke* factors is a uniquely effective means for assaying whether a defendant's waiver of the right to counsel is knowing and intelligent. *Padilla*, 819 F.2d at 956 (citing *Von Moltke*, 332 U.S. at 723, and *Gipson*, 693 F.2d at 111); *see Sanchez*, 858 F.2d at 1467; *Gipson*, 693 F.2d at 111–12.

Read as such, these cases do not have the effect of precluding application of the pragmatic approach to the waiver question—as Supreme Court authority commands and our caselaw in the aggregate endorses, including our decisions in *Willie*, *Vann*, and *Turner*. That is because they do not mandate a formalistic and

29

rigid adherence to *Von Moltke*-related inquiries as the *sole* means for determining whether a defendant's waiver of the right to counsel is knowing and intelligent. Consequently, they effectively leave space for our recognition that a court may properly discern the answer to the knowing-and-intelligent question by propounding a variety of questions tailored to the particular circumstances of the case, and that these "surrounding facts and circumstances" in certain instances may well provide the answer to the question of whether "the defendant 'understood his right to counsel and the difficulties of *pro se* representation'" at the time of his waiver. *Turner*, 287 F.3d at 983 (quoting *Willie*, 941 F.2d at 1389); *see Vann*, 776 F.3d at 763.

This point of harmony is well illustrated in *Vann.* There, we acknowledged—as *Padilla*, *Sanchez*, and *Gipson* would agree—that a *Faretta* hearing that is centered on a colloquy on the record between the court and the defendant regarding the *Von Moltke* factors is "probably the best way . . . for the district court to satisfy itself that defendant's waiver of a right to counsel was done intelligently." *Vann*, 776 F.3d at 763. But we also recognized that such a hearing is only *one* means to ensure that a defendant's waiver of the right to counsel is knowing and intelligent and that "the absence of that means is 'not error as a matter of law.'" *Id.* (quoting *Stanley*, 739 F.3d at 645). Viewed through the harmonizing lens that we adopt here, the broad language of *Padilla*, *Sanchez*, *Gipson* does not stand in opposition to the substantive reasoning of

30

cases like *Vann*.

In sum, we must endeavor to interpret our cases in a manner that permits them to coexist harmoniously with overarching and controlling Supreme Court precedent and with each other. And when we do so, we cannot read the controlling rule of our cases as being—as Mr. Hansen maintains—that a district court is required in every instance to conduct a *Faretta* hearing in which it propounds queries to a defendant regarding each and every *Von Moltke* factor in order to avoid reversal. Instead, our cases should be read in the aggregate as embodying the pragmatic approach outlined above.[4]

Moreover, Mr. Hansen's invocation of the intra-circuit conflict rule is misguided. To be sure, under that rule, "[i]n cases of conflicting circuit precedent our court 'follow[s] earlier, settled precedent over a subsequent deviation therefrom.'" *Sabillon-Umana*, 772 F.3d at 1334 n.1 (second alteration in original) (quoting *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996)). However, Mr. Hansen's invocation of this rule rests on dubious premise: that "[a]*ll* of the cases that support Mr. Hansen's position preceded *all* of the cases that support the Government's position." Aplt.'s Reply Br. at 9. In fact, our decisions in *Weninger* and, to a lesser extent, *Warledo*—which both predated Mr. Hansen's

---

[4]    As we conclude our caselaw mandates this pragmatic approach, we do not address Mr. Hansen's policy-based arguments regarding the benefits of a rule requiring reversal whenever a district court fails to address each and every *Von Moltke* factor. *See* Aplt.'s Reply Br. at 10–14.

cited cases (*Gipson, Padilla*, and *Sanchez*)—exhibit features of the pragmatic approach that would later become fully manifested in cases like *Vann* and *Turner*. *See Weninger*, 624 F.2d at 164 ("To ascertain whether [a defendant] knowingly and intelligently waived his right to counsel, we must consider 'the total circumstances of the individual case including background, experience and the conduct of the accused person.'" (quoting *Warledo*, 557 F.2d at 727); *Warledo*, 557 F.2d at 727 (noting in dicta that, although "[u]ndoubtedly the trial court could have questioned the defendants with more particularity" regarding the *Von Moltke* factors, "the sum total" of the particular circumstances in that case "do[] not, however, constitute a deprivation which would of itself justify a reversal").

Furthermore, "[a] court considering discordant decisions must first determine whether the perceived conflict between them is *real*." GARNER ET AL., *supra*, § 36, at 300 (emphasis added); *see* Michael Duvall, *Resolving Intra-Circuit Splits in the Federal Courts of Appeal*, 3 FED. CTS. L. REV. 17, 19 (2009) ("[I]nconsistency between two panel decisions is *not necessarily an intra-circuit split*, however. A third panel will first attempt to reconcile the conflicting cases before concluding that a true intra-circuit split exists." (emphasis added)). And, as our analysis above reveals, even though they might be understood, at first blush, to be at odds with each other, there is no *real* conflict between the broad language of the cases that Mr. Hansen identifies as controlling—*Padilla*, *Sanchez*, and *Gipson*—and our subsequently issued decisions in *Willie*, *Vann*, and *Turner*,

32

which Mr. Hansen claims "are not good law and should not be followed" because of the intra-circuit conflict rule. Aplt.'s Reply Br. at 8 (capitalization and bold-face font omitted). To the contrary, those decisions can and "should be harmonized," and our analysis above has precisely that effect. GARNER ET AL., *supra*, § 36, at 300. Therefore, the intra-circuit conflict rule is inapposite here; that is because there is no "subsequent deviation" to take into account. *Sabillon-Umana*, 772 F.3d at 1334 n.1 (quoting *Haynes*, 88 F.3d at 900 n.4).

**B**

With the controlling legal standards clarified, we apply them to the relevant factual circumstances of this case. We conclude that (1) it is important, in securing a knowing and intelligent waiver of the right to counsel, for a court to take reasonable steps to ensure that the defendant understands his obligation to adhere to federal (i.e., controlling) procedural and evidentiary rules; (2) the district court here failed to engage in a sufficiently thorough colloquy with Mr. Hansen that would properly warn him under the circumstances of this case that—if he proceeded pro se—he would be obliged to adhere to federal procedural and evidentiary rules; and (3) no case-specific factors are present here that would permit us to conclude that, despite the district court's inadequate warnings, it nevertheless correctly concluded that Mr. Hansen's waiver of his right to counsel was knowing and intelligent at the time it was made. In sum, we conclude that the district court erred in accepting Mr. Hansen's ostensible waiver of the right to

33

counsel and allowing him to proceed pro se.

**1**

In evaluating whether the district court erred in finding Mr. Hansen's waiver of the right to counsel knowing and intelligent on this record, we first highlight the importance of a judicial inquiry into a potential pro se defendant's understanding of the need to personally adhere to federal procedural and evidentiary rules. Although not an explicitly enumerated *Von Moltke* factor, the topic of a defendant's willingness to adhere to court rules is an important one. It is one of the "other facts essential to a broad understanding of the whole matter" of self-representation. *Von Moltke*, 332 U.S. at 724; *accord Padilla*, 819 F.2d at 956–57.

Its importance has been highlighted by the Supreme Court's cases and our own. For example, in *Faretta*, the Court noted: "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." 422 U.S. at 834 n.46. And, in concluding that the defendant had "knowingly and intelligently" waived the right to counsel, the Court noted that he had been warned that he "would be required to follow all the 'ground rules' of trial procedure," *id.* at 836. *Cf. Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000) ("[T]he trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal 'chores' for the defendant that

34

counsel would normally carry out." (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 184 (1984))); *Patterson*, 487 U.S. at 299–300, 300 n.13 (explaining that, "at trial, counsel is required to help even the most gifted layman adhere to the rules of procedure and evidence," and that it is important for the defendant to be warned that he will face "the full 'dangers and disadvantages of self-representation'" (quoting *Faretta*, 422 U.S. at 835)).

Likewise, our cases also have looked at whether the defendant made the waiver with an understanding that he would need to follow the applicable procedural and evidentiary rules. *Compare Padilla*, 819 F.2d at 957 (holding waiver invalid when the defendant "was not cautioned until after trial began that he would be expected to follow applicable rules of evidence and procedure and that the judge could not assume the role of advisory counsel for him"), *with Brett Williamson*, 859 F.3d at 863 (holding waiver was valid when the district court warned, *inter alia*, that "the procedural rules of the courtroom would not be relaxed for [the defendant's] benefit"). Moreover, there is decisional law of our sister circuits that lends support to the idea that "the defendant's understanding of the rules of evidence, procedure and courtroom decorum" is "especially important to the determination of whether a defendant's decision to proceed *pro se* is valid." *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002); *cf. United States v. Ladoucer*, 573 F.3d 628, 633–34 (8th Cir. 2009) (noting, in affirming the trial court's finding of a knowing and intelligent waiver, that "[t]he court stressed that

35

[the defendant] would be required to follow the rules of procedure, evidence and decorum and that the court would not be on either attorney's side").

Furthermore, we note that the Supreme Court has intimated that the Benchbook for U.S. District Court Judges provides helpful information regarding topics that are appropriate and important for trial courts to delve into when assessing the knowing and intelligent nature of a defendant's waiver of counsel. *See Patterson*, 487 U.S. at 300 n.13. And, though neither the Court nor we purport to set out a "precise litany" of questions that are necessary, *Padilla*, 819 F.2d at 959; *accord Tovar*, 541 U.S. at 88, we would be remiss not to acknowledge, as some of our sister circuits already have, that the Benchbook provides valuable guidance of this type. *See United States v. Jones*, 452 F.3d 223, 229 (3d Cir. 2006) (noting that a "set" of "model questions derived from" the Benchbook "provide[s] a 'useful framework' in deciding whether a defendant knowingly and voluntarily wishes to proceed *pro se*" (quoting *United States v. Peppers*, 302 F.3d 120, 136 (3d Cir. 2002))); *see also United States v. Bankston*, 820 F.3d 215, 223 (6th Cir. 2016) (describing the Benchbook as providing a "model inquiry"); *United States v. Bell*, 901 F.2d 574, 577 (7th Cir. 1990) (stating that "[g]uidelines for the appropriate inquiry are set forth" in the Benchbook).

In particular, as relevant here, we note that the Benchbook specifically provides a line of inquiry reasonably calculated to warn a defendant regarding the obligation to abide by federal procedural and evidentiary rules. Specifically, the

current edition of the Benchbook recommends that, during a *Faretta* hearing, district judges specifically ask: "Do you understand that the rules of evidence govern what evidence may or may not be introduced at trial, that in representing yourself, you must abide by those very technical rules, and that they will not be relaxed for your benefit?" FED. JUDICIAL CTR., BENCHBOOK FOR U.S. DISTRICT COURT JUDGES 6 (6th ed. 2013) [hereinafter BENCHBOOK].[5]  Likewise, the Benchbook recommends that district judges ask: "Do you understand that those rules [i.e., the Federal Rules of Criminal Procedure] govern the way a criminal action is tried in federal court, that you are bound by those rules, and that they will not be relaxed for your benefit?" *Id.*  Although we reiterate that neither the Supreme Court nor our court has "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," *Tovar*, 541 U.S. at 88, *accord Padilla*, 819 F.2d at 959, the Benchbook underscores—like the controlling precedent discussed *supra*—the importance, in securing a knowing and intelligent waiver of the right to counsel, of a court conducting a thorough colloquy with a defendant that is reasonably calculated to ensure that the defendant understands his obligation to adhere to federal procedural and evidentiary rules.

---

[5]     This document is accessible in PDF form on the Federal Judicial Center's website.  https://www.fjc.gov/sites/default/files/2014/Benchbook-US -District-Judges-6TH-FJC-MAR-2013.pdf.

## 2

Having established that it is important for the district court to ensure that the defendant understands his obligation to adhere to federal procedural and evidentiary rules, we explain why the district court here failed to engage in a sufficiently thorough colloquy with Mr. Hansen that would properly warn him under the circumstances of this case that—if he proceeded pro se—he would be obliged to adhere to federal procedural and evidentiary rules. In coming to this conclusion, we examine (a) the *Faretta* hearing itself, and (b) other communications between the district court and Mr. Hansen outside of the *Faretta*-hearing context that the government argues can inform our understanding of whether Mr. Hansen's waiver was knowing and intelligent when it was made.

### a

Our primary concern as to whether the district court conducted such a thorough colloquy with Mr. Hansen arises from our review of the *Faretta* hearing. After consideration of the hearing transcript, we conclude that the court did not—in light of Mr. Hansen's remarks—adequately warn him that he would be required to follow federal procedural and evidentiary rules *before* the court determined that his waiver was knowing and intelligent.

At the start of the *Faretta* hearing, after a brief exchange with Mr. Hansen regarding the indictment, his desire to proceed without counsel, and the impending trial date, the district court asked the government whether there were

other topics that should be covered.[6]

In response, the government requested that the court make several further inquiries about: whether Mr. Hansen was under the influence of any drugs, his educational background, his knowledge of legal proceedings, whether he understood the charges and penalties he was facing, *whether he understood that he would be required to abide by the procedural rules of the court*, whether he understood that he would have to take an oath to testify truthfully before testifying, and whether he understood that he would not be able to challenge the effectiveness of his representation if he decided to proceed without counsel. The district court then went on to discuss some, but not all, of these topics with Mr.

---

[6] We pause to underscore that, although counsel for the government and the defense may properly aid the court in ensuring that it has conducted the necessary inquiries to provide a foundation for a defendant's knowing and intelligent waiver of the right to counsel, the constitutional responsibility to conceive of and propound the proper inquiries rests squarely on the shoulders of the trial court and cannot be delegated to others. *See Von Moltke*, 332 U.S. at 723 ("The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel." (quoting *Johnson*, 304 U.S. at 465)). Put another way, the trial court must satisfy *its* independent obligation to provide warnings to the defendant on topics important to his waiver of the right to counsel that are thorough enough that we may conclude that the defendant knowingly and intelligently waived his right to counsel. *See Tovar*, 541 U.S. at 88–89 ("[B]efore a defendant may be allowed to proceed *pro se*, he must be warned [i.e., by the district court] specifically of the hazards ahead."); *Brett Williamson*, 859 F.3d at 862 ("[B]efore a court may grant a waiver, *it must ensure* the defendant is 'aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" (emphasis added) (quoting *Maynard*, 468 F.3d at 676)).

Hansen.[7]

As relevant here, the court asked Mr. Hansen whether he understood "that in a legal proceeding there are rules that the court will follow and will require that *all of the parties* before the court follow," and Mr. Hansen responded, "Yes." R., Vol. I, at 234 (emphasis added). If this "Yes" had been the only answer given, we might have been able to conclude the district court's warning was sufficient to ensure Mr. Hansen's understanding of this topic.

But, to its credit, the court asked a similar but more specific version of this question moments later that, significantly, focused more precisely on Mr. Hansen's *own obligation* to follow federal procedural and evidentiary rules: "You understand that if you choose to represent yourself you will be required to comply with the rules of procedure in this court and the rules of evidence. Do you understand that?" *Id.* at 237. And, critically, Mr. Hansen answered, "*No.*" *Id.* (emphasis added). In response, the court did try briefly to follow up on this line of inquiry, stating: "If you do not comply with the rules, you will not—if you do not commit yourself to being prepared to comply with the rules, *you're not in a position to represent yourself.*" *Id.* (emphasis added). Mr. Hansen's reply, however, went in an entirely different direction; he claimed that he "shouldn't even be in this court because [he was] not the defendant" and that "President FDR

---

[7]    The court never addressed the last two of these topics requested by the government but our resolution of this appeal does not turn on these omissions.

40

and [C]ongress concocted a fraud upon the American people where they put a similar name on top of a living person to pay the debts of a foreign corporation." *Id.* at 237–38.

Tellingly, the government realized that Mr. Hansen's answers were problematic. When the court then asked the government whether there were any other questions that needed to be addressed, the government stated that "the responses do give the government some pause and concern as to whether it would be appropriate under these circumstances for Mr. Hansen to represent himself." *Id.* at 239. In particular, the government noted that this was because Mr. Hansen "*specifically said he could not abide by the rules of procedure and evidence.*" *Id.* at 239–40 (emphasis added). Mr. Hansen interrupted to contest this characterization. *Id.* at 240 ("I didn't say that."). So, the district court tried once more by making the following inquiry: "If you represent yourself, will you endeavor to your best effort to comply with the rules of procedure and the rules of evidence that a party is required to follow in this court?" *Id.* at 240. Mr. Hansen responded by stating that he "can't represent [him]self because [he is] [him]self." *Id.* The court noted that it had "to make a judgment as to whether or not [he] [was] willing to comply with the court's rules," but Mr. Hansen responded by stating, "I don't understand," and wondering aloud whether the appointment of counsel would "change anything as far as jurisdiction." *Id.* at 241. The government subsequently noted that it continued to "have some significant

41

concerns as to whether it would be appropriate for the court to permit [Mr. Hansen] to represent himself," and the district court recessed to allow Mr. Hansen to talk with his standby counsel. *Id.* at 245.

After the recess, and his apparent discussion with standby counsel, Mr. Hansen apologized for his outbursts and indicated that he did want to represent himself, with standby counsel. *Id.* at 246–47. The court then summarily concluded that Mr. Hansen had knowingly and intelligently waived his right to counsel. *Id.* at 247. Critically, however, the court never returned to Mr. Hansen's statement that he did *not* understand that he would be required to follow federal rules of procedure and evidence.

We conclude that when faced with Mr. Hansen's at best ambiguous and unclear responses in the *Faretta* hearing regarding this topic—which included Mr. Hansen's flat denial that he understood he would be obliged to follow federal procedural and evidentiary rules—the district court was required to do more to ensure that his waiver of counsel was knowing and intelligent. Based on Mr. Hansen's responses, we believe that the court could not make a reasonable determination regarding whether Mr. Hansen did or did not understand his obligation to follow the federal rules, and, as the court itself recognized, it needed to make an informed "judgment" on this subject because Mr. Hansen was "not in a position to represent [him]self" if he did not have such an understanding. *Id.* at 237, 241.

42

To be sure, we recognize that the government argues that any concerns about Mr. Hansen's "uncertainty about courtroom procedures" are mitigated because "the district court allowed defendant to consult with standby counsel [before finally deciding to waive counsel]." Aplee.'s Resp. Br. at 21. But Mr. Hansen's meeting with standby counsel was not on the record, and, accordingly, we have no basis for concluding that standby counsel explained to Mr. Hansen that, upon waiver of counsel, he would be personally obliged to abide by federal evidentiary and procedural rules. More importantly, while the "appointment of standby counsel is preferred" when a defendant has elected to represent himself, *Padilla*, 819 F.2d at 959, appointment of standby counsel does not "relieve the district court of its responsibility to ensure that defendant's waiver of counsel is knowingly and intelligently made." *Id.* at 960; *see Taylor*, 113 F.3d at 1144 n.2. Consequently, while the appointment of standby counsel here was a positive step, it sheds virtually no light on whether Mr. Hansen's waiver of the right to counsel was knowing and intelligent at the time it was made—and, more specifically, on whether Mr. Hansen understood that, if he proceeded pro se, he would be obliged to personally adhere to federal procedural and evidentiary rules.

In sum, based on the record of the *Faretta* hearing, we are unable to conclude that the district court took sufficient steps to reasonably ensure that Mr. Hansen understood what he was doing and that his choice to proceed without counsel was "made with eyes open." *Tovar*, 541 U.S. at 88 (quoting *Adams*, 317

43

U.S. at 279).

**b**

We now examine other communications between the district court and Mr. Hansen outside of the *Faretta*-hearing context to assess whether they demonstrate that the district court correctly determined that Mr. Hansen's waiver was knowing and intelligent—and in particular that Mr. Hansen understood that he would be required to follow federal procedural and evidentiary rules—at the time he waived his right to counsel. However, we are constrained to conclude that these communications do not evince support for the district court's conclusion that Mr. Hansen possessed such an understanding.

After the *Faretta* hearing, Mr. Hansen and the district court had another oral exchange at a later pretrial hearing about the role that standby counsel would play. The court explained how standby counsel could assist in making objections and discussing legal issues with the court. In explaining how the trial would proceed, the district judge stated: "I want to emphasize that although you have chosen to present your own defense, you are still required to follow the rules of procedure and the rules of evidence. [The standby counsel] is here to aid you and will advise you as appropriate." R., Vol. II, at 119.

Although this statement directly addressed the topic of adherence to federal procedural and evidentiary rules, under the circumstances here, we are not convinced that the district court's statement demonstrates that Mr. Hansen

44

understood that he was required to follow these rules at the time of his waiver. This is because the statement was provided in the middle of the court's extended pretrial remarks to the parties. *See id.* at 115–22. And, while the court did ask the parties certain questions during those remarks, notably, it did not ask for any response from Mr. Hansen regarding its statement concerning the need to follow federal rules of procedure and evidence, and Mr. Hansen did not provide a response.

Without more, we thus do not see how *the court's* bare statement at issue here provides a sufficient basis for us to conclude that the court's earlier determination that *Mr. Hansen* had knowingly and intelligently waived his right to counsel was correct. The court's later statement gives us no insight into Mr. Hansen's understanding *at the time of the waiver* that he would be obliged to personally follow federal procedural and evidentiary rules. *See Padilla*, 819 F.2d at 956 ("*Faretta* requires a showing on the record that the defendant who elects to conduct his own defense had some sense of the magnitude of the undertaking and the hazards inherent in self-representation *when he made the election*." (emphasis added)).

The government points, however, to general warnings the district court gave to Mr. Hansen about the dangers he faced by waiving his right to counsel.[8]

---

[8] *See, e.g.*, R., Vol. I, at 231–32 ("I should also advise you that tax matters can be complicated . . . . [Y]ou are at substantial risk of facing the

These general warnings, however, do not serve to dispel our concern about whether the district court's communications with Mr. Hansen properly warned him about one important, specific obligation of self-representation—the obligation to personally adhere to federal procedural and evidentiary rules. In particular, the court's general warnings did not touch on the precise challenges of navigating the world of trial procedure and evidence without counsel. *Cf. Sanchez*, 858 F.2d at 1467 & n.7 (noting that "[t]he trial judge's general advice against self-representation and his failure to inquire into [the defendant's] reasons for seeking substitute counsel" were inadequate to assess the knowing and intelligent nature of the waiver and that "[a]dmirable good faith efforts to be fair to the defendant . . . cannot undo constitutional violations"); BENCHBOOK, *supra*, at 6. Accordingly, we cannot conclude that these general warnings had the effect of reasonably ensuring that Mr. Hansen's waiver of the right to counsel was knowing and intelligent at the time it was made.

Likewise, the government also relies on Mr. Hansen's multiple statements that he wanted to represent himself. But a defendant's willingness to proceed pro

prosecution in this case and you may be convicted by a jury and would be well advised to have counsel to represent you and guide you through this process."); *id.*, Vol. IV, at 205–06 ("I would just say sit back and observe that if you think about what you're doing and the consequences this will have upon you and your family, you may come to a conclusion that these arguments that you're making have been repeatedly made and rejected by this court and by the Court of Appeals and you need to seriously think about the consequences for yourself and your family in pursuing this course of action.").

se, standing alone, does not allow us to infer that he "knows what he is doing and his choice is made with eyes open." *Tovar*, 541 U.S. at 88 (quoting *Adams*, 317 U.S. at 279). More specifically, these actions do not help us establish whether or not Mr. Hansen's waiver was—at the time it was made—knowing and intelligent with respect to his obligation to personally adhere to federal procedural and evidentiary rules.

* * *

In sum, focusing solely on the record of the district court's pretrial communications with Mr. Hansen—most notably, at the *Faretta* hearing—we cannot conclude under the circumstances here that the district court properly warned Mr. Hansen of his obligation, as a pro se litigant, to personally abide by federal procedural and evidentiary rules. Put another way, we cannot conclude that the court's warnings had the effect of reasonably ensuring that Mr. Hansen understood this obligation at the time of his waiver. And the consequence of this failing is to cast grave doubt on whether Mr. Hansen's waiver of the right to counsel was knowing and intelligent. That is because controlling caselaw from the Supreme Court and our own court—as well as provisions of the Benchbook—clearly indicate that a defendant's understanding of this obligation to personally abide by the court's procedural and evidentiary rules is one of the "other facts essential to a broad understanding of the whole matter" of self-representation. *Von Moltke*, 332 U.S. at 724; *accord Padilla*, 819 F.2d at 956–57.

47

However, as noted, "we have recognized that '[t]here are certain limited situations . . . where a waiver may be valid' even when the inquiry by the court is deficient." *Vann*, 776 F.3d at 763 (alteration and omission in original) (quoting *Hughes*, 191 F.3d at 1323)). Therefore, we turn to consider whether there are case-specific factors present here that would permit us to conclude, despite the district court's inadequate warnings, that the district court nevertheless correctly determined that Mr. Hansen's waiver of his right to counsel was knowing and intelligent when it was made.[9] After careful consideration of the record, however, we discern no such factors.

**3**

"The information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the

---

[9] We focus only on those case-specific factors that logically may be germane to whether the district court correctly determined that Mr. Hansen's waiver was knowing and intelligent at the time it was made, despite the particular deficiency that we have identified in the court's warnings concerning Mr. Hansen's obligation to adhere to federal procedural and evidentiary rules. In other words, we ask whether there are case-specific factors that would allow us to conclude that—despite this specific deficiency—the district court correctly determined that Mr. Hansen's waiver of the right to counsel was knowing and intelligent as to the matter of adherence to these federal rules at the time it was made. Thus, for example, though *Tovar* mentions the complexity of the charges as one potential case-specific factor, *see* 541 U.S. at 88, we do not deem that factor particularly germane to whether the district court correctly concluded that Mr. Hansen understood that he would be required to follow the pertinent procedural and evidentiary rules at the time of his waiver and, therefore, do not discuss this factor further.

48

defendant's education or sophistication . . . ." *Tovar*, 541 U.S. at 88. In this regard, we previously have determined that—in light of a defendant's experience with the criminal justice system, education, or other like circumstances—even where the trial court's warnings regarding self-representation were inadequate, the court correctly determined that the defendant's waiver of the right to counsel was knowing and intelligent at the time it was made. *See, e.g.*, *Hughes*, 191 F.3d at 1321, 1324 (noting that the trial "court did not conduct a colloquy regarding [the defendant's] waiver of his right to counsel" and, "[a]lthough an on-the-record colloquy would have been preferable," the defendant, "*a practicing attorney*, made deliberate decisions regarding his representation, decisions which he cannot now claim resulted in a violation of his right to counsel" (emphasis added)); *McConnell*, 749 F.2d at 1451 (recognizing that "[t]he record shows that the trial judge did not strictly follow the test we established . . . for a judge's responsibility in questioning a defendant about his waiver of counsel" but holding that "it would be absurd" to find a waiver unknowing because the defendant, *inter alia*, "had attended two and one half years of law school"). Furthermore, we have effectively recognized that a defendant's pretrial litigation conduct could constitute a case-specific factor that would permit a reviewing court to conclude that the district court correctly determined that the defendant's waiver was knowing and intelligent at the time it was made, despite the court's inadequate warnings regarding self-representation. *See, e.g.*, *Willie*, 941 F.2d at 1389.

We are constrained to conclude, however, that none of the germane case-specific factors can convince us that—despite the district court's inadequate warnings regarding Mr. Hansen's obligation to follow federal procedural and evidentiary rules—the court nevertheless correctly determined that his waiver of the right to counsel was knowing and intelligent at the time it was made. In coming to this conclusion, we discuss (a) Mr. Hansen's experience with the criminal justice system, sophistication, and education, (b) Mr. Hansen's pre-trial conduct, and (c) assuming without deciding that it could be relevant, Mr. Hansen's conduct at trial.

**a**

Focusing first on case-specific factors such as the defendant's experience with the criminal justice system, sophistication, and education, these factors cut against a conclusion that the district court correctly determined that Mr. Hansen's waiver of his right to counsel was knowing and intelligent when it was made. Mr. Hansen had no formal legal training and had no prior experience with criminal trials, and, moreover, testified at the *Faretta* hearing that he had never been a party to a civil lawsuit. *See, e.g.*, *Tovar*, 541 U.S. at 88; *Padilla*, 819 F.2d at 958.

While the district court relied on Mr. Hansen's extensive chiropractic education in finding his waiver knowing and intelligent, *see* R., Vol. I, at 233–34 (describing Mr. Hansen's undergraduate education and chiropractic doctorate); *id.*, Vol. IV, at 205–06 ("You are obviously a well educated man. You have also

50

been successful in a number of pursuits in your life . . . ."), we do not believe that Mr. Hansen's educational attainments provide any meaningful assurance that—despite his colloquies with the trial court which were at best ambiguous and unclear—the district court correctly determined that Mr. Hansen understood his obligation to personally adhere to federal procedural and evidentiary rules at the time of his waiver. *Cf. United States v. Johnson*, 534 F.3d 690, 694 (7th Cir. 2008) (noting that the defendant "has a master's degree in finance and economics," but highlighting as particularly relevant to the knowing-and-intelligent inquiry that he also had "an extensive history of arrests and convictions over the last forty years"). There is no indication from the record or the parties' arguments that Mr. Hansen's education offered him any meaningful insight into the rigors of a criminal trial, generally, and, more specifically, into the potential procedural and evidentiary hurdles that defendants face in such a setting in responding to the prosecution's case.

Accordingly, we cannot conclude that case-specific factors such as the defendant's experience with the criminal justice system, sophistication, and education support a conclusion that the district court correctly determined that Mr. Hansen's waiver of the right to counsel was knowing and intelligent at the time it was made.

**b**

We reach a similar conclusion regarding Mr. Hansen's pretrial litigation

51

conduct, which we explore in some detail.  Contrary to the government's assertion, it does not "further indicate[] a knowing waiver of counsel."  Aplee.'s Resp. Br. at 25–26.  Indeed, much of Mr. Hansen's pretrial litigation conduct provides further reason to doubt the district court's determination that his waiver was knowing and intelligent at the time it was made.  In coming to this conclusion, we discuss our decision in *Willie*, Mr. Hansen's many pretrial filings, and his conduct at several pretrial hearings.

In *Willie*, the defendant "submitted at least ten pretrial *pro se* petitions to the court, including amended pleadings, a motion to deny the government's request for reciprocal discovery, a Petition in Abatement, two Motions to Dismiss, and two sets of jury instructions."  941 F.2d at 1389.  At a later pretrial hearing, "the court allowed [the defendant] to represent himself, having apparently satisfied itself after observing [the defendant]'s conduct and reviewing his numerous petitions throughout the preceding months that [the defendant] understood the difficulties of *pro se* representation and still insisted on representing himself."  *Id.*

On appeal, the defendant argued the "he did not make a knowing, voluntary and intelligent waiver of his right to counsel because he was inadequately informed of the hazards of self-representation."  *Id.* at 1388.  We acknowledged that, "[r]egrettably," the trial court did not "fully discuss these issues with [the defendant] on the record."  *Id.* at 1388–89.  However, relying on the defendant's

numerous *pro se* motions, his repeated assertions of his right to self-representation, and his refusal to work with appointed counsel, we concluded that "the facts on the record are sufficient in this case to establish that [the defendant] intelligently, knowingly and voluntarily waived his right to counsel," despite the absence of adequate warnings by the district court regarding self-representation. *Id.* at 1390–91.

As *Willie* illustrates, we have recognized that pretrial litigation conduct can be relevant to our analysis of whether a district court correctly determined that a waiver was knowing and intelligent at the time it was made. But Mr. Hansen's pretrial litigation conduct is meaningfully distinguishable from that of the *Willie* defendant and does not lead us to the same or a similar conclusion to the one that we reached there. In other words, it does not lead us to conclude that the district court correctly determined that Mr. Hansen knowingly and intelligently waived his right to counsel.

Even before his initial appearance, Mr. Hansen submitted a wide range of filings that suggest that he failed to understand he would be required to abide by federal procedural and evidentiary rules. His first filing was labeled "Reschedule Court Date" and informed the court that he would "not be available to attend the court date scheduled for November 17, 2016"—though he had received a summons from the court to do so—and went on to "propose a new court date be scheduled for December 18, or thereafter." R., Vol. I, at 31 (Reschedule Ct. Date,

filed Nov. 3, 2016). But, as the government's responsive pleading pointed out, this "notice" did not comply with federal procedural rules in that it neither moved for a continuance nor "state[d] the grounds on which it is based." *Id.* at 34 (United States' Opp'n to Def.'s Pleading, filed Nov. 4, 2016) (quoting FED. R. CRIM. P. 47(b)). And, more fundamentally, the summons Mr. Hansen received was no mere invitation; rather, under the federal rules, a summons "*require*[*s*] the defendant to appear before a magistrate judge at a stated time and place." FED. R. CRIM. P. 4(b)(2) (emphasis added); 1 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 51 (4th ed.), Westlaw (database updated Apr. 2019) ("A summons is an *order* by a judge addressed to the defendant, directing him or her to appear in court at a specified time and date to answer the specified charges." (emphasis added) (footnote omitted)). The mandatory significance of the summons, however, seems to have been lost on Mr. Hansen.

As the case progressed, Mr. Hansen continued to file documents that do not support the notion that he understood he would be personally obliged to adhere to federal procedural and evidentiary rules. The district court construed the above rescheduling request as a motion to continue and denied it. Mr. Hansen responded by writing "I reject your offer to contract" diagonally by hand across the front of the order and returning the order to the court. R., Vol. I, at 41 (Filing, Nov. 14, 2016).

Similarly, Mr. Hansen later submitted a copy of the indictment, upon which

54

he again directed a communication to the court in diagonal handwriting, stating "Accepted for Value by Grantee, Returned for Value by Grantor-Settlor, On Special Deposit Without Recourse, IT IS ORDERED: Discharge All Obligations / Presentments / Bonds / Fees / Taxes / Tithes to Extinguish the Debt and Settle the Account of DELYNN HANSEN." *Id.* at 170 (Filing, Nov. 17, 2016). In addition to violating local rules on formatting through these submissions, *see* D. UTAH CRIM. R. 57-1; D. UTAH CIV. R. 10-1(a) ("Text must be typewritten *or plainly printed and double-spaced* except for quoted material and footnotes." (emphasis added)), these filings again failed to "state the grounds on which [they were] based and the relief or order sought," FED. R. CRIM. P. 47(b). Similarly, among other filings of Mr. Hansen was one that was signed in part with a thumbprint and contained a declaration purporting to excuse the district court judge from presiding under "his emergency war powers jurisdictional duties." R., Vol. I, at 46.

Such filings by Mr. Hansen certainly do not support the notion that—in spite of the district court's inadequate warnings—the district court correctly determined that he understood his obligation to personally adhere to federal procedural and evidentiary rules at the time of his waiver.

Put another way, unlike *Willie*, Mr. Hansen's pretrial conduct—as evidenced by his written filings—does not support a finding that Mr. Hansen "understood the difficulties of *pro se* representation," specifically, the need to

55

follow at trial the controlling (i.e., federal) procedural and evidentiary rules. 941 F.2d at 1389; *see also Taylor*, 113 F.3d at 1142 (distinguishing *Willie*'s reliance on the defendant's pretrial conduct because the *Taylor* defendant's pretrial motion practice was less extensive). Indeed, the overwhelming majority of Mr. Hansen's filings affirmatively suggest his failure at the time of his waiver to understand his need to adhere to these rules.

In addition to his written filings, Mr. Hansen participated in several pretrial hearings. Conduct in such hearings could conceivably inform a reviewing court's conclusion regarding whether the district court correctly determined that a defendant's waiver was knowing and intelligent at the time it was made. *See Willie*, 941 F.2d at 1389. However, Mr. Hansen's conduct at these hearings sheds no meaningful light on the knowing-and-intelligent inquiry, much less provides a reasonable basis for concluding that the district court correctly determined that he understood his obligation to abide by federal procedural and evidentiary rules at the time of his waiver. Therefore, his conduct in those hearings does not warrant further discussion.

In sum, although a defendant's pretrial litigation conduct could constitute a case-specific factor that, in limited circumstances, could justify—despite a trial court's inadequate warnings regarding self-representation—a conclusion that the district court nevertheless correctly determined that a defendant's waiver was knowing and intelligent at the time it was made, Mr. Hansen's pretrial litigation

56

conduct will not support such a conclusion here.

## c

Lastly, we acknowledge that the government asks us to consider one other case-specific factor that it believes could militate in favor of a determination that Mr. Hansen's waiver of his right to counsel was knowing and intelligent when it was made: that is, Mr. Hansen's conduct at trial. *See* Aplee.'s Resp. Br. at 27 ("Although a valid waiver of counsel must take place before trial, this Court may look to events at trial as corroboration of a valid waiver."). Whether a defendant's trial conduct is material to an inquiry into the correctness of a district court's conclusion that a defendant's pretrial waiver of his right to counsel was knowing and intelligent at the time it was made is a matter of first impression in this circuit. We assume without deciding that such conduct is material to this inquiry. However, we conclude that Mr. Hansen's trial conduct provides no basis for us to conclude that the district court correctly determined that Mr. Hansen's waiver was knowingly and intelligently made.

To start, contrary to the government's contentions, we clarify that this question is one of first impression. Indeed, to the extent that our binding cases have communicated regarding the subject, it has been through mixed signals and dicta. For example, in *Padilla*, we hinted that happenings at trial are *not* relevant to whether a district court correctly determined that a waiver was knowing and intelligent at the time it was made. In particular, we suggested concern regarding

57

the fact that the defendant in that case "was not cautioned *until after trial began* that he would be expected to follow applicable rules of evidence and procedure." 819 F.2d at 957 (emphasis added). We made this comment in coming to the conclusion that "consideration of all the available facts and circumstances of this case does not compel the conclusion that defendant made a knowing and intelligent waiver of representation by counsel." *Id.* at 958. We do not read this comment, however, as *holding* that a court may not consider trial occurrences in evaluating whether a waiver of the right to counsel was knowing and intelligent when made.

To support its position, the government cites one binding decision of our court—*Turner*—but we do not believe that case definitively resolves the question before us. There, in holding that a defendant's waiver of the right to counsel was knowing and intelligent, we did note that the defendant, *inter alia*, "gave opening and closing statements, objected to the Government's evidence, called his own expert witness, and successfully argued to remain free pending sentencing." 287 F.3d at 984. However, *Turner*'s analysis did not rely on the defendant's trial conduct as a case-specific factor tending to demonstrate that the defendant's waiver of the right to counsel was knowing and intelligent at the time it was made—*even though* the trial court's warnings regarding the hazards of self-representation were deficient. To the contrary, we ultimately grounded our decision on the fact that the district court *had properly performed* its duty in

58

providing the defendant "with enough information to make an informed, knowing, and thus legally intelligent decision whether to waive his right to counsel." *Id.* Because *the district court* had "provided [the defendant] with enough information," *id.*, *the defendant*'s subsequent conduct could not have had a meaningful role to play in the court's analysis. In other words, *Turner*'s reference to such trial conduct was at most descriptive dictum. Accordingly, we do not interpret *Turner* as having decided whether a defendant's performance at trial is material to the inquiry into whether the defendant knowingly and intelligently waived before trial the right to counsel.

Thus, in sum, to the extent that our binding cases have communicated regarding this subject, it has been through mixed signals and dicta. The government also cites, however, an unpublished decision from our court, *United States v. Sealander*, 91 F.3d 160, 1996 WL 408368 (10th Cir. 1996) (unpublished table decision), in support of its position. In that case, the panel concluded that "[t]he questioning of [the defendant] by the district court, the advise [sic] it gave him, the availability of standby counsel, his prior experience with the criminal justice system, the pleadings he filed in this case, and *his performance at trial* support[ed] [the] conclusion that [the defendant] made a knowing, intelligent, and voluntary waiver of his Sixth Amendment right to counsel." *Id.* at *13 (emphasis added). It goes without saying that, as an unpublished decision, *Sealander* is not binding on us. And we do not read *Sealander*'s brief reference to performance in

59

trial as definitively opining on this question. Accordingly, we decline to rely on that decision.

Therefore, it is a question of first impression in this circuit whether a defendant's trial conduct is material to the inquiry into whether a district court correctly concluded that a defendant's pretrial waiver of his right to counsel was knowing and intelligent at the time it was made.[10] However, we need not and thus do not decide this open question here. *See People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 1008 (10th Cir. 2017) ("[I]f it is not necessary to decide more, it is necessary not to decide more." (alteration in original) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))), *cert. denied*,

---

[10] We do note, however, that at least one circuit has concluded that such conduct is categorically immaterial. *See United States v. Mohawk*, 20 F.3d 1480, 1485 (9th Cir. 1994) ("That [the defendant] handled his defense more or less capably . . . is, under our precedents, irrelevant. 'The manner in which a defendant conducts his defense cannot establish his state of mind at the time he opted for self-representation.'" (quoting *United States v. Aponte*, 591 F.2d 1247, 1250 (9th Cir. 1978))); *see also Dallio v. Spitzer*, 343 F.3d 553, 568 (2d Cir. 2003) (Katzmann, J., concurring in the judgment) ("Nor is the fact that [the defendant] ultimately performed competently in conducting his defense necessarily material to determine the validity of a Sixth Amendment waiver under *Faretta*."); *United States v. Balough*, 820 F.2d 1485, 1489 (9th Cir. 1987) ("The government also argues that [the defendant] represented himself well . . . . Even if true, this is irrelevant to show that [the defendant] understood the dangers and disadvantages of self-representation at the time he sought to waive his right to counsel."); *cf. Godinez v. Moran*, 509 U.S. 389, 399 (1993) (noting that "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself").

60

138 S. Ct. 649 (2018).  Even if we assume that such trial conduct could be material, the government's argument fails here because Mr. Hansen's conduct at trial does not favor a determination that his waiver of his right to counsel was knowing and intelligent when it was made.

In support of its argument to the contrary, the government argues that Mr. Hansen "controlled the presentation of his defense," "cross-examined government witnesses," "called his own witnesses," "introduced exhibits in support of his defense," and pursued a legally sound if ultimately unsuccessful good-faith defense.  Aplee.'s Resp. Br. at 28.  But we do not see how—and the government does not explain how—Mr. Hansen's control of his own defense and purported pursuit of a potentially valid defense could tell us anything here about whether the district court correctly determined that, at the time of his waiver of the right to counsel, Mr. Hansen understood that he would be personally required to follow federal procedural and evidentiary rules, *viz.*, about whether the court correctly determined that Mr. Hansen's waiver was knowing and intelligent.

While we assume that a defendant's cross-examination, calling of witnesses, and proper introduction of exhibits could tend to show that the defendant waived the right to counsel with the understanding that he or she would be required to follow federal procedural and evidentiary rules, the record here does not demonstrate such knowledge.  In particular, the record reveals that Mr. Hansen's cross-examination repeatedly strayed into irrelevant and legally

61

inappropriate topics, demonstrating no understanding that he would be required to follow federal evidentiary rules. *See, e.g.*, R., Vol. II, at 244 (Mr. Hansen: "This is Black's Law talking about the definition of a closed account." The government: "We have discussed the use of the law as evidence, Your Honor." The Court: "Yeah, this would not be an appropriate question to ask of this witness."); *id.* at 326 (Mr. Hansen: "[D]o you know what the Uniform Commercial Code is?"); *see also id.* at 191 (Mr. Hansen: "Does the IRS hire psychics?").

And while Mr. Hansen called three witnesses, he sought to introduce similarly impermissible testimony through them. *See, e.g.*, *id.* at 458 (The Court: "Let me make it clear, you are not to testify as to what the law is or your understanding of the law, simply what was said at this seminar." The Witness: "But Your Honor, it wasn't -- it is on -- it's on the Federal Reserve website, it's not law." The Court: "Again listen --" The Witness: "It is just there for everyone to see." Mr. Hansen: "Can't she relate to what she had read." The Court: "No. No, she cannot relate to what she has read because the relevance of this is merely what was said at the seminar so that they can judge what your state of mind was." Mr. Hansen: "Fine."). Again, it is difficult to see how this *supports* a conclusion that Mr. Hansen understood that he would be required to follow federal evidentiary rules. Furthermore, while Mr. Hansen did introduce certain exhibits, he struggled to do so, arguably suggesting that he did not understand—when he

62

elected to waive the right to counsel—that he would be personally required to comply with the Federal Rules of Evidence. *See, e.g.*, *id.* at 241 (Mr. Hansen: "Can you -- can you read what it says?" The Court: "This is not yet received in evidence." Mr. Hansen: "Okay." The Court: "You can't read it to the jury yet." Mr. Hansen: "Okay. They can read it themselves then.").

Thus, after reviewing Mr. Hansen's trial conduct, we conclude that—even assuming that we may consider trial conduct as evidence of Mr. Hansen's understanding at the time of his waiver—his trial conduct does not demonstrate that the district court correctly determined that Mr. Hansen's waiver was knowing and intelligent at the time it was made—in particular, with respect to the obligation to personally adhere to federal procedural and evidentiary rules.

\* \* \*

We thus hold that none of the germane case-specific factors convince us that—despite the district court's inadequate warnings regarding Mr. Hansen's obligation to follow federal procedural and evidentiary rules—the court nevertheless correctly determined that Mr. Hansen's waiver of the right to counsel was knowing and intelligent when it was made.

## C

In sum, we conclude that the district court did not adequately "ensure [Mr. Hansen] [was] 'aware of the dangers and disadvantages of self-representation.'" *Brett Williamson*, 859 F.3d at 862 (quoting *Maynard*, 468 F.3d at 676). While we

63

do not "prescribe[] any formula or script," *Tovar*, 541 U.S. at 88, that a district court must follow in warning defendants regarding the hazards of self-representation, our fundamental concern is that the district court here failed to ensure that Mr. Hansen understood that, if he waived his right to counsel, he would have to personally follow federal procedural and evidentiary rules. Although not an explicitly enumerated *Von Moltke* factor, the topic of a defendant's willingness to adhere to court rules is an important one. It is one of the "other facts essential to a broad understanding of the whole matter" of self-representation. *Von Moltke*, 332 U.S. at 724; *accord Padilla*, 819 F.2d at 956–57.

Notably, we determine that when faced with Mr. Hansen's at best ambiguous and unclear responses in the *Faretta* hearing regarding this topic—which included Mr. Hansen's blunt denial that he understood he would be obliged to follow federal procedural and evidentiary rules—the district court was required to do more to ensure that his waiver of counsel was knowing and intelligent. Based on Mr. Hansen's responses, we believe that the court could not make a reasonable determination regarding whether Mr. Hansen did or did not understand his obligation to follow the federal rules at the time of the waiver.

Furthermore, we have assessed other communications between the district court and Mr. Hansen outside of the *Faretta*-hearing context to determine whether they demonstrate that—despite the district court's inadequate warnings—the court nevertheless was correct in determining that Mr. Hansen's waiver of the right to

64

counsel was knowing and intelligent at the time it was made, particularly with respect to the obligation to abide by federal procedural and evidentiary rules. But we conclude that these communications do not demonstrate this. Lastly, we recognized that, under limited circumstances, certain case-specific factors could permit us to conclude that, despite the district court's inadequate warnings, the district court nevertheless correctly determined that Mr. Hansen's waiver of his right to counsel was knowing and intelligent when it was made. But, after careful consideration of the record, we discern no such case-specific factors. Thus, we must conclude that the district court erred in finding that Mr. Hansen knowingly and intelligently waived his right to counsel.

### III

Based on the foregoing, we **REVERSE** the district court's waiver determination and **REMAND** the case, instructing the court to **VACATE** its judgment regarding Mr. Hansen in full and to conduct further proceedings consistent with this opinion.[11]

---

[11] In light of our disposition of this case, we need not decide a separate issue raised by Mr. Hansen: whether the district court erred in imposing two special conditions of supervised release.